## CORY v. PHYSICAL CULTURE HOTEL, Inc.

No. 1884.

District Court, W. D. New York.
April 22, 1936.

John S. Powers, of Buffalo, N. Y. (E. Bernard Gary, of Buffalo, N. Y., of counsel), for complainant.

Mayer C. Goldman, of New York City, for defendant.

RIPPEY, District Judge.

This action was brought in equity by Archie B. Cory, a photographer of Dansville, N. Y., for an injunction and for damages against defendant for infringement of a copyrighted photograph No. J–13596 duly registered June 26, 1933, of which plaintiff is the sole proprietor. Defendant is a New York State corporation with a place of business at Dansville, and owned and operated at that place, at the time of the alleged infringement and for some years preceding, what is known as the "Physical Culture Hotel." Defendant is a subsidiary of the Bernarr Macfadden

Foundation, Inc., with principal offices in the city of New York. Bernarr Macfadden was and is the dominating genius of both enterprises and also the publisher of the Physical Culture Magazine, a monthly, having a nation-wide circulation with an average of 252,941 copies per. month over the period of the alleged infringement.

The bill of complaint was filed July 25, 1934, and contains all necessary jurisdictional allegations and complies with all the requirements of practice and procedure in an action of this kind. In compliance with Supreme Court Rule 2 for Practice and Procedure under section 25 of the Copyright Act (17 U.S.C.A. following section 25), a specimen of the copyrighted photograph and copies of the reproductions charged to infringe were appended to the bill of complaint. The infringement charged is the reproduction by defendant of plaintiff's copyrighted photograph in seven monthly issues of the Physical Culture Magazine, during the months of October, 1933, to April, 1934, inclusive, without plaintiff's license or consent, as part of advertisements of defendant's hotel. The appropriation and use of the photograph was admitted. All told, at least 1,770,587 copies were printed and distributed. The answer, filed September 14, 1934, was a general denial. At the opening of the trial, two amended answers were filed by permission of the court. In the first, defendant sets up as a separate defense that the airplane from which the photograph in question was taken was operated and flown under plaintiff's direction and supervision illegally and at a dangerously low altitude and in violation of the Air Commerce Regulations prescribed by the United States Department of Commerce, Aeronautics Branch, effective January 1, 1914, and particularly in violation of sections 69 and 71 thereof, and that said flight was deliberate and reckless and highly dangerous to life and property and for the purpose of illegally obtaining an airplane photograph of the defendant's hotel for the sole use and benefit of plaintiff as a commercial photographer, because of which the photograph obtained by Cory was taken illegally and the alleged copyright thereof was not a valid, legal, and existing copyright and should be canceled and revoked. In the second amended answer defendant asserts additionally, and as a second separate defense, that the airplane from which the photograph was taken was operated and flown over defendant's property without its consent illegally, dangerously, and recklessly and in violation of the Air Commerce Regulations, whereby the flight constituted a trespass on the defendant's property; that thereby plaintiff acted in bad faith and "has barred himself from coming into a court of equity and obtaining any relief against this defendant." The Air Commerce Regulations referred to prescribed a minimum altitude of 1,000 feet over "congested parts of cities, towns or settlements."

■ The hotel proper was located about halfway up a steep incline of the valley wall east of the village of Dansville. The hill rises at least 1,000 feet abruptly above the valley floor. Defendant's property is all located on the sidehill. Below are open fields on which is located the Rotary Club Airport landing field. Above the hotel and along the side of this ridge run the tracks of the Lackawanna Railroad. In front, to the west and some distance below the hotel, a highway extends from the village proper along the side of the valley wall and to the north and east. West of the highway the slope extends down to the level of the village proper. For at least 1,-000 feet to the east of the settled portion of the village there are no buildings or structures except the Lackawanna tracks and station located to the east and north and on the highway and on a higher level than the hotel, the hotel proper, three hotel cottages at a lower level than the hotel and to the south, and the highway mentioned. The east wall of the valley is thickly studded with large trees. Immediately in front of the hotel and to the west of it, and between it and the highway, is a strip of. level ground, with shrubs and driveway, some 200 feet in width. The location of defendant's hotel and the general physical situation surrounding it made it a peculiarly difficult subject of oblique aerial photography. The defendant's property was not in a congested area within the meaning of the Air Commerce Regulations.

Archie B. Cory was in June, 1933, employed by Norton B. Webster, the latter being engaged in the general photographic business with a studio in Dansville, N. Y., and had been in his employ for a number of years. Webster had been engaged in general photographic work since 1920. He procured his training as a photographer in the Illinois College of Photography. Subsequently, on completing his course he

opened up a studio at Hamburg, N. Y., and later at Dansville. His first interest in aerial photography was aroused in 1928 because of its commercial possibilities. The first exposure he ever made with an aerial camera was of defendant's hotel at the suggestion of defendant. He had previously been employed regularly by defendant to take ground pictures for the hotel, and he had made a fairly complete selection of interior and exterior views on the grounds, which works were satisfactory to defendant. A Miss Ferrier connected with defendant's hotel had employed him over a period of years to take the pictures, had selected the ones desired by defendant, contracted for them, and paid for them in behalf of defendant.

More than two years before the picture in question was taken, one of the employees of the hotel suggested to Webster that a picture satisfactory to Macfadden could only be taken from the air. Webster had a camera known as a four by five garflex, a speed type of machine, and he made arrangements with Pickard to take some flights. Some ten flights were made, but the results were not satisfactory. He found a special camera was necessary. One was built by the Eastman Company, but its cost was beyond his means, and he set about to build a special camera of his own especially for the purpose of taking photographs of the hotel. With the new camera he and Pickard made two flights in 1931 and two in 1932. The pictures were exhibited to Miss Ferrier, but were not satisfactory because they showed vibration and ground speed. All told, he made about fourteen flights in an effort to obtain a photograph, as to all of which flights a representative of defendant was aware. Pickard had given lessons to Macfadden in flying, and the latter suggested to Pickard that he would like to get an aerial picture of the hotel. Up to the time sunbaths were put into the hotel service, Webster had general permission to make the flights and take the pictures. After sunbaths were installed, Miss Ferrier asked him not to make flights without first calling her so that she could stop the sunbaths for the flights, and this requirement was strictly adhered to. The sunbaths were directly on top of the hotel without covering, and any taking such baths would be included in the picture. She desired to avoid embarrassment to the guests at the hotel. Thereafter, Webster called her up, she fixed the hours for the flight, the results of the photographic effort were shown her, and she approved or rejected the photographs. Thus defendant's representative required notice in advance of each flight, and thereupon gave consent, and the flights were made at times and under conditions, so far as the patients were concerned, satisfactory to the defendant.

After repeated unsuccessful efforts, Webster decided that he would give up the effort of securing a satisfactory photo and suggested to Cory that he make the attempt. Cory made three flights, one on June 12, 1933, one on June 16, 1933, and one on June 22, 1933. On the first two flights he took several pictures, but they were all unsuccessful. On June 22d defendant's representative at the hotel was notified by Cory and Webster of the purpose of Cory and Pickard to make an attempt again to secure a satisfactory photograph, and they asked her permission to make the flight between 2 and 4 p. m. This permission was given. A number of exposures were made and, on June 23d, shown to Miss Ferrier at the hotel. The one that was subsequently copyrighted was selected by her as the most satisfactory. Thereupon the negative film was placed over a piece of glass through which the light would show, and there was written upon the film with a pen in India ink the copyright line and ownership, as required by the Copyright Law (section 18 [17 U. S.C.A. § 18]). Twelve prints were made from this film so marked on the morning of June 24th, one of which was left on the reception room table in the studio, one of which was put into the showcase in the street, two were mailed to the Copyright Office on that date, and the remaining eight were kept as reserve stock to be sold to the general public. No other prints were ever made by plaintiff or for him of this photo in the size shown on the original plate. Thereafter the India ink marking was removed from the negative by plaintiff because the negative was to be used for projection prints and enlargements, and the copyright notice was placed on thin transparent material known as kodaloid, to be placed on the negative in case of contact or production prints, and on the paper in case of projection prints. Large projection prints were made from the negative of the copyrighted photograph, and the enlargements were placed in the studio for exhibition. They were shown to employees of defendant's hotel, including Johnson, who was the general

manager; Johnson having gone to plaintiff's studio at the suggestion of Bernarr Macfadden for the purpose of seeing the photograph and securing a price in connection with its use on mailing pieces. He also inquired the price of one of the large pictures for the defendant's New York office and one for the lobby of the hotel, and asked for quotation on two of the prints. Plaintiff quoted the price of $25 for the use of the picture for a year on the mailing pieces, subject to the copyright line, and $15 for the large print, and plaintiff required a stipulation that any advertisement in the mailing piece was to carry the copyright notice. At the time the pictures were exhibited to Johnson, copyright notices thereon were plainly visible. Johnson made arrangements to place the pictures on exhibition in the hotel and for sale at a convention, and required that the copyrighted picture be arranged with other views in a panel for Macfadden's examination a few days prior to the opening of the convention. There were five prints in the panel, and it was framed and hung in the lobby of the hotel; the copyrighted photograph occupying the center of the panel. It was there several weeks. Macfadden was present at the convention, in July, 1933, and observed and became familiar with the picture. He exhibited much interest.

Stacy, who is known as the publicity manager of defendant, in charge of sales promotion, purchased one of the prints. Seven were sold at 25 cents each. From this picture Stacy caused to be made three plates for publication in connection with defendant's advertising of the hotel in Physical Culture Magazine, which was the only advertising medium used by defendant. The copyright marking was clipped off from the picture and did not appear on the plates or in the reproductions in the advertising matter. Thus stripped of the notice, the copyrighted photo was appropriated and used by the defendant in the seven monthly issues of this magazine.

It was not until March, 1934, that the plaintiff discovered the reproduction of his copyrighted photograph. He thereupon immediately called attention of defendant to the infringement. Defendant acknowledged the infringement and assumed responsibility for the publication, but claimed that it was a mistake. An effort was made by plaintiff to procure a settlement, but without success. Defendant's answer was

to send a letter to the publisher of the Dansville Breeze, a newspaper publication of Dansville, N. Y., a part of which statement was published in this newspaper on November 3, 1934, in which Macfadden is alleged to have stated that he intended to see that plaintiff was "properly prosecuted for illegal measures adopted in procuring the picture in violation of the Department of Commerce ruling," and plaintiff was charged with having illegally obtained the picture. Macfadden, for whose conduct the defendant admits that it was responsible, made inquiries of the United States Department of Commerce as to the procedure necessary to prosecute the complainant in accordance with his threatened prosecution. Subsequent investigation was made by the Department of Commerce, and plaintiff and his pilot were exonerated from any improper conduct in securing the picture or in making the flight.

█ Upon the facts in this case, there can be no doubt that the defendant is bound by the acts of Miss Ferrier, Macfadden, and others in authorizing the flight and the taking of the picture, or that the flight was made and picture taken with the knowledge, acquiescence, and consent of defendant. Surely Cory and Pickard were justified in assuming that they had the right to make the flight in the manner they made it. Repeated ratification by defendant of Miss Ferrier's previous acts in securing photographs of the interior and exterior of the hotel and of the grounds surrounding it appears in the evidence. It would be impossible to believe that defendant did not know and approve of the various similar flights of Pickard, Webster, and Cory over a period of two years for the sole purpose of securing a photograph satisfactory to defendant. Macfadden himself suggested the effort; at the end, defendant took what the plaintiff had finally secured. Christian v. American Druggist Syndicate (C.C.A.) 285 F. 359; Calhoon v. Buhre, 75 N.J.Law, 439, 67 A. 1068; Citizens' Trust & Surety Co. v. Zane (C.C.) 113 F. 596, affirmed (C.C.A.) 117 F. 814.

█ The rights of the owner of land to the air space above has been the subject of much discussion in recent years. Attempt has been made by owners of land to invoke the maxim, "Cujus est solum ejus est usque ad coelum et ad infernos," imported into our law from the ancient past, to sustain their contention that the owner of the surface owns the unoccupied air space

982

above "to the heavens." It is pointed out in Thrasher v. City of Atlanta, 178 Ga. 514, 173 S.E. 817, 825, 99 A.L.R. 158, that the maxim is a "generalization from old cases involving the title to space within the range of actual occupation, and any statement as to title beyond was manifestly a mere dictum." In Rochester Gas & Electric Corporation v. Dunlop, 148 Misc. 849, 266 N.Y.S. 469, 471, it is said that: "If that maxim ever meant that the owner of land owned the space above the land to an indefinite height, it is no longer the law." In Swetland v. Curtiss Airports Corporation (C.C.A.) 55 F.(2d) 201, 203, 83 A.L.R. 319, it is said: "In every case in which it [the maxim] is to be found it was used in connection with occurrences common to the era, such as overhanging branches or eaves. These decisions are relied upon to define the rights of the new and rapidly growing business of aviation. This cannot be done consistently with the traditional policy of the courts to adapt the law to the economic and social needs of the times." It is unnecessary to review in any detail the many divergent views of authors and textbook writers on the subject. Out of it all has grown the rule followed in the foregoing decisions and adapted to the economic and social needs of our times that the owner of land has the exclusive right to so much of the space above as may be actually occupied and used by him and necessarily incident to such occupation and use, and any one passing through such space without the owner's consent is a trespasser; as to the air space above that actually occupied and used and necessarily incident to such occupation and use, the owner of the surface may prevent its use by others in so far as that use unreasonably interfered with his complete enjoyment of the surface and the space above which he occupies, on the theory of nuisance. See, also, Smith v. New England Aircraft Co., 270 Mass. 511, 170 N.E. 385, 69 A.L.R. 300. The height at which an airplane operator may pass above the surface without trespassing is a question depending for solution on the facts in the particular case, and this question is unaffected by the regulations promulgated by the Department of Commerce, under the Air Commerce Act of 1926 (49 U.S.C.A. § 171 et seq.). Swetland v. Curtiss Airports Corporation, supra.

 Cory had the right of flight over the property of defendant without its consent for the purpose of traveling through the air space or for other legitimate purpose, provided, (1) he did so in a reasonable manner; and (2) it was at such a height as not to interfere unreasonably with the possessor's use and enjoyment of his property; (3) he complied with federal and state air traffic regulations. It is elsewhere pointed out that the matter of Air Commerce Regulations or state regulations as to altitude is not material on the issues in this case. In any event, there was no violation of the New York State Air Traffic Rules (New York General Business Law [Consol.Laws, c. 20] § 245, subd. 7 (c). The property was used as a health resort. The flight was made in a reasonably careful, safe, and prudent manner by a highly trained pilot of long and extensive experience in flying who had made an exhaustive study of the peculiar flying conditions in and around the property in question and had flown over it more than a thousand times. The flight was made at such a height as not to unreasonably interfere with the land owned by defendant or the use of the air space above it possessed by the defendant, but whether it was such as to interfere with defendant's enjoyment of possession requires further consideration. To secure a proper picture, in view of the physical situation and air currents, it was necessary for the pilot to come in from the south, pass along the side of the hill and close to the hotel, curve sharply to the west just before reaching the building, throttle down his motor to avoid vibration, and hover long enough for plaintiff to make the exposure without showing ground speed. On the occasion when the copyrighted photo was taken, as had been done many times before, the pilot circled around above the property several times to get the plane in proper position, came in from the south at a height of upwards of 1,000 feet, gradually descended until he nearly reached the hotel to a height of some two or three hundred feet above the plane of the roof of the hotel, then turned to the west some 900 feet from the hotel, where the plane hovered dead still for an instant, then dropped a few feet to a proper position, and the picture was taken. The plane then proceeded to the west over unoccupied land and landed at the airport. When the picture was taken, the plane was at least 600 feet above unoccupied land; when it passed over the tops of the trees in front of the hotel, it was some 250 feet

above the trees. The operation was dangerous to the occupants of the plane. It was deemed by defendant to be distasteful to the guests taking sun baths on top of the hotel. In my opinion such an operation of a plane, if unauthorized, would unreasonably interfere with the enjoyment and use of defendant's property as a health resort, and it is so found on the evidence in this case. This finding is made in spite of the fact which is also found that plaintiff crossed only the southwest corner of defendant's property, did not pass over the building, and probably was not over any part of defendant's property at the time the picture was taken.

As above indicated, the evidence establishes that the flight in question and in the manner made was authorized by defendant and the picture was taken with its permission and consent. Under those circumstances, it becomes unnecessary to decide whether an unauthorized flight over property for the sole purpose of securing a picture of the owner's property for commercial purposes is legitimate. It is sufficient to say that the flight and the purpose for which it was made under the facts in the case at bar was legitimate. However, the right asserted by plaintiff is the right to the exclusive use of his copyright, and illegal acts, if any, not affecting that particular right will not bar his remedy for infringement. Scribner v. Straus (C.C.) 130 F. 389; 13 C.J. 1197.

Defendant ended the infringement in the April issue of the Physical Culture Magazine and destroyed the plates from which the prints were made, but that fact does not bar injunctive relief. Alfred Decker Cohn Co. v. Etchison Hat Co. (D. C.) 225 F. 135; Gilmore v. Anderson (C. C.) 38 F. 846.

Defendant admitted the appropriation and use of plaintiff's copyrighted photograph without his consent; it asserts that it had a right to use the picture of its own property notwithstanding. There can be no difference in the rights of ownership and use between photos taken of a person and of an inanimate object. Defendant presented the hotel as a subject for photographing. Plaintiff took the picture. Defendant paid nothing for the work or materials used or the finished picture. Cory took the picture, and developed and printed it all at his own expense and for his own benefit. As a consequence, plaintiff

had the sole proprietary right therein and was entitled to the copyright. Lumiere v. Robertson-Cole Distributing Corporation (C.C.A.) 280 F. 550, 24 A.L.R. 1317. The right to copyright gave plaintiff "the exclusive right to print, reprint, publish, copy, and vend the copyrighted work." 17 U.S.C.A. §§ 1 (a), 23. The defendant, by printing, copying, and using, was an infringer and liable for damages as provided in section 25 of the Copyright Law, as amended (17 U.S.C.A. § 25). Plaintiff has preserved his copyright by uninterrupted compliance with the statutory requirement for the application of the copyright notice to all prints of the copyrighted photograph.

Although the evidence shows that plaintiff was damaged, the amount of actual damages was not established. It was impossible for plaintiff to trace the profits flowing to defendant from the use of the copyrighted photograph. Nevertheless, in lieu thereof, plaintiff should be compensated for the wrongful appropriation and use of his property. Section 25 (b) of the Copyright Act was enacted to meet just such a situation. Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 79 L.Ed. 862. That section provides that the court may, in its discretion, assess damages, in lieu of actual damages and profits shown, in the minimum sum of $50 and not exceeding $200 in case of a newspaper reproduction of a copyrighted photograph, and in the minimum amount of $250 but not in excess of $5,000 in all other cases.

Defendant takes the position that the Physical Culture Magazine is a newspaper and that the maximum allowable damages are $200, while plaintiff asserts that the magazine was not a "newspaper" within the meaning of that section. In section 5 (b) of the act (17 U.S.C.A. § 5 (b) Congress separately classified "periodicals, including newspapers," as a subject of copyright. The Copyright Act contains no other subdivision in which a monthly magazine can properly fall. The fact that Congress felt it necessary to include newspapers within the "periodical" classification would indicate that a "newspaper" is not a "periodical," or, at least, that such was the understanding of Congress at the time of the passage of the act. It must so have understood that the words "periodical" and "newspaper" had a different meaning and required different treatment when the amendatory act of March 4, 1909, was enacted. Section 5

was amended, but the amendment contains no change in wording of subdivision (b). At the same time, section 25 (b) was amended, but no change was made in that portion which relates to "a newspaper reproduction of a copyrighted photograph." This exception does not include "periodicals," but is limited exclusively to "a newspaper," and it must be held that Congress intended to exclude "periodicals" from the exception. Otherwise, it would have used the same expression as used in section 5 of the same act. It may be that newspapers and magazines are periodicals. It does not follow that all magazines and periodicals are newspapers. Thus it would seem to follow from the wording of the act itself that a copyright of periodicals including newspapers is authorized; that damages within the higher range specified in section 25 (b) is authorized in case of infringement by publication of the copyrighted photograph in any periodical except in the case where reproduction is in a newspaper, where the lower range applies.

If it were necessary to go beyond the act itself, clear and authoritative distinctions have been drawn between a "newspaper" and a "magazine." In Webster's New International Dictionary (page 1455), a "newspaper" is defined as "a paper printed and distributed at stated intervals, usually daily or weekly, to convey news, advocate opinions, etc., now usually containing also advertisements and other matters of public interest"; and "magazine" is defined (page 1295) as "a pamphlet published periodically containing miscellaneous papers, especially critical and descriptive articles, stories, poems, etc., designed for the entertainment of the general reader." The radical difference between a "magazine" and a "newspaper" has been pointed out in the opinions of the Attorney General and accepted over the past century in connection with the administration of the postal laws. 4 Op.Attys.Gen. 10; 4 Op.Attys. Gen. 407; 5 Op.Attys.Gen. 375; 25 Op. Attys.Gen. 594. The Supreme Court has pointed out the difference. Houghton v. Payne, 194 U.S. 88, 96, 24 S.Ct. 590, 48 L. Ed. 888. By common understanding and in ordinary speech, the distinction is clear. An examination of the Physical Culture Magazines in evidence indicates that they could by no stretch of the imagination be classified as a newspaper. Defendant, on the record in this case, did not so classify them, but, on the contrary, excluded this magazine from the newspaper classification. It must be held as a fact that the Physical Culture Magazine is not included within the exception stated in section 25 (b) to the higher range of allowable damages.

The question then arises as to what amount would be just in this case under the pertinent facts. Efforts had been made by plaintiff's partner over a period of two or more years at defendant's solicitation and by its encouragement to secure a suitable photograph of the hotel. None thus taken and thereafter exhibited to defendant's agents and employees were satisfactory until the photograph in question was produced. That it had great value to defendant is evidenced by its immediate and continuous appropriation and use for advertising purposes. It was widely distributed and was used in the most effective way defendant could use it for profit. Whatever plaintiff might have expected to derive from it for advertising purposes was practically destroyed, and to that extent he was deprived of a means of livelihood. That it was a work of mechanical excellence and the product of a high degree of skill and artistry is clearly evidenced, not only from an examination of the photograph, but by its selection and use by defendant. The success of plaintiff was possible only because of his highly specialized study, training, and proficiency in the difficult branch of the art known as "oblique aerial photography," requiring not only skilled and practiced determination and selection of proper conditions of lights, shadows, visibility, wind direction, and speed, but accurate timing and position and perfect coordination between pilot and photographer, as well as lightning thought and decision. The hazards and dangers involved in the work and the patience required cannot be overestimated. In view of these and other facts, such an award should be made within the permissible limits as will fully and fairly and equitably compensate plaintiff for the infringement. There was a clear, intentional, deliberate, and willful appropriation and use of plaintiff's copyrighted photograph by defendant with full advance knowledge of plaintiff's rights therein and with a deliberate and contemptuous disregard of those rights. Defendant's conduct preliminary to and during the pendency of the suit not only held plaintiff up to ridicule and humiliation in the commu-

nity in which he lives, but spotted him as a pirate and a deliberate and willful wrongdoer.

It is a question of fact whether the seven reproductions of the copyrighted photograph in the Physical Culture Magazine constituted seven separate infringements. Each issue of the magazine was a separate and distinct set-up involving a new and independent arrangement of copy and advertising matter and a printing based on a separate and distinct order in each case, unrelated to the order for any preceding edition or printing. The running of the advertisement was not for any fixed series of printings, but it was possible to discontinue the insertion at any time. Each issue of the magazine was complete in itself and was distributed separately without reference to the others. While the text of the advertisement in the first three issues is substantially the same, it differs from that in the last four issues, where the text is similar, but through all issues there are found some changes. A special key number was given to each publication of the advertisement to enable defendant to identify the replies to the advertisements with each particular issue. Thus defendant was enabled to compute the value of each advertisement with reference to the issue in which it was printed. The identity of each advertisement is clearly identified with the issue in which it was printed. I think it must be held as a fact that each separate printing constituted a separate infringement. Reed v. Carusi, Fed.Cas. No. 11,642; Schellberg v. Empringham (D.C.) 36 F.(2d) 991. There were 252,941 copies of each issue of the magazine printed and distributed.

The question of law still remains whether the statute requires or permits a separate award within the limits prescribed for each printing under the facts in this case. Had there been seven separate copyrighted photographs, each of a different subject, or had the suit been against the publisher of the magazine where the same copyrighted photograph was used by separate advertisers, recovery might be had for seven separate and distinct infringements. Mail & Express Co. v. Life Publishing Co. (C.C.A.) 192 F. 899; Westermann Co. v. Dispatch Printing Co., 249 U. S. 100, 105, 39 S.Ct. 194, 63 L.Ed. 499. The Supreme Court in the Westermann Case left open for future consideration the question of whether such would be the

case where there was merely a repetition of the single copyrighted work by the same infringer. No later decision of the Supreme Court has been called to our attention where that question has been considered. The only case in the lower federal courts since the Westermann decision where the question has been passed upon, so far as we have been able to find, is Schellberg v. Empringham, supra, where $4,000 was awarded for each of two infringing editions of the same book published by the same infringers.

In Douglas v. Cunningham, 294 U.S. 207, 55 S.Ct. 365, 366, 79 L.Ed. 862, the court construed the meaning of section 25 (b), second, of the Copyright Law as a necessary incident to the determination of the question actually presented. The Supreme Court said: "The trial judge may allow such damages as he deems to be just and may, in the case of an infringement such as is here shown, in his discretion, use as the measure of damages one dollar for each copy—Congress declaring, however, that just damages, even for the circulation of a single copy, cannot be less than $250, and no matter how many copies are made, cannot be more than $5,000."

In that case, there was infringement of a single copyright in a single printing. Here there was an infringement of a single copyright in seven distinct printings. The Douglas decision, therefore, does not settle the question left open in the Westermann Case. The words "no matter how many copies are made" must relate to the copies made in the single printing. We believe that an award of $5,000 damages is a just award under the facts in this case. Such an award is permissible within the decision of the Douglas Case without the necessity of determining whether separate awards within the minimum limit of $250 and the maximum limit of $5,000 are required to be made. This question we do not decide.

The case is in some respects novel and was difficult and extraordinary, requiring careful, extended, and painstaking preparation, original investigation, and exploration of a subject in certain aspects with few landmarks for guidance. Plaintiff may apply for the allowance of counsel fee on five days' notice prior to and to be made a part of the decree if an allowance should be granted.

Upon the foregoing, a decree should be entered in favor of plaintiff. If addition-

al findings are desired, application may be made at the same time that application is made for counsel fee, and a decree carrying out this decision may be presented for signature.