Argued July 2, reversed and remanded November 7, 1962, petition
for rehearing denied January 5, 1963·

# THORNBURG *v.* PORT OF PORTLAND
376 P. 2d 100

*James H. Clarke,* Portland, argued the cause for appellants. With him on the briefs were Wayne Hilliard, Cecil H. Greene, and Koerner, Young, Mc-Colloch & Dezendorf, Portland.

*Lofton L. Tatum,* Portland, argued the cause for respondent. With him on the brief were John G. Holden and Wood, Wood, Tatum, Mosser & Brooke, Portland.

Before McAllister, Chief Justice, and Rossman, Warner, Perry, Sloan, O'Connell and Goodwin, Justices.

GOODWIN, J.

A trial jury denied plaintiffs the compensation which they sought in an action for "inverse condemnation".[1] In so doing, the jury necessarily found that the Port of Portland had not taken the plaintiffs' property. The plaintiffs appeal.

The issues in their broadest sense concern the rights of landowners adjacent to airports and the rights of the public in the airspace near the ground. Specifically, we must decide whether a noise-nuisance can amount to a taking.

---

[1] Inverse condemnation is the popular description of a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency. See, e.g., State Highway Com. v. Stumbo et al, 222 Or 62, 66, 352 P2d 478, 480 (1960); Tomasek v. State Highway Com'n, 196 Or 120, 248 P2d 703 (1952).

The Port of Portland owns and operates the Portland International Airport. It has the power of eminent domain. It has used this power to surround itself with a substantial curtilage, but its formal acquisition stopped short of the land of the plaintiffs. For the purposes of this case, the parties have assumed that the Port is immune from ordinary tort liability. Further, it is conceded that injunctive relief would not be in the public interest. Aircraft are not ordinarily operated by the Port itself, but by third parties which use its facilities. Air navigation and other related operations are, for all practical purposes, regulated by a federal agency. The Port merely holds the airport open to the flying public.

The plaintiffs own and reside in a dwelling house located about 6,000 feet beyond the end of one runway and directly under the glide path of aircraft using it. Their land lies about 1,500 feet beyond the end of a second runway, but about 1,000 feet to one side of the glide path of aircraft using that runway.

The plaintiffs contend that flights from both runways have resulted in a taking of their property. Their principal complaint is that the noise from jet aircraft makes their land unusable. The jets use a runway the center line of which, if extended, would pass about 1,000 feet to one side of the plaintiffs' land. Some planes pass directly over the plaintiffs' land, but these are not, for the most part, the civilian and military jets which cause the most noise.

The plaintiffs' case proceeded on two theories: (1) Systematic flights directly over their land cause a substantial interference with their use and enjoyment of that land. This interference constitutes a nuisance. Such a nuisance, if persisted in by a private party, could ripen into a prescription. Such a

continuing nuisance, when maintained by government, amounts to the taking of an easement, or, more precisely, presents a jury question whether there is a taking. (2) Systematic flights which pass close to their land, even though not directly overhead, likewise constitute the taking of an easement, for the same reasons, and upon the same authority.

The Port of Portland contends that its activities do not constitute the taking of easements in the plaintiffs' land. The Port argues: (1) The plaintiffs have no right to exclude or protest flights directly over their land, if such flights are so high as to be in the public domain, i.e., within navigable airspace as defined by federal law.[2] (2) The plaintiffs have no right to protest flights which do not cross the airspace above their land, since these could commit no trespass in any event. Accordingly, the Port contends, there is no interference with any legally protected interest of the plaintiffs and thus no taking of any property for which the plaintiffs are entitled to compensation. In short, the Port's theory is that the plaintiffs must endure the noise of the nearby airport with the same forbearance that is required of those who live near highways and railroads. The

[2] The Air Commerce Act of 1926, as amended by the Civil Aeronautics Act of 1938, provided that the Civil Aeronautics Authority could prescribe air traffic rules. See 49 USC (1952) § 551 (a) (7). One of these rules fixed 500 feet as the minimum safe altitude over persons, vehicles, and structures. 14 CFR 60.107 (1947 Supp). There can be do doubt that Congress has, during all material times, denominated the airspace 500 feet above any person, vessel, vehicle or structure in other than congested areas as navigable airspace which is subject to a public right of transit. The authority of Congress to pass such legislation is bottomed on the commerce power, and the validity of the legislation is not in question. See Braniff Airways v. Nebraska Board, 347 US 590, 596, 74 S Ct 757, 98 L Ed 967 (1954); Smith v. New England Aircraft Co. Inc., 270 Mass 511, 525, 526, 170 NE 385, 69 ALR 300 (1930).

Port's arguments, supported as they are by substantial authority, prevailed in the lower court, even though they were not entirely responsive to the plaintiffs' case. (The plaintiffs founded their case upon a nuisance theory; the defendant answered that there was no trespass.)

The trial court proceeded as if the rights of the plaintiffs were limited by the imaginary lines that would describe a cube of airspace exactly 500 feet high and bounded on four sides by perpendicular extensions of the surface boundaries of their land. The trial court thus in effect adapted the law of trespass to the issues presented in this case, and held that unless there was a continuing trespass within the described cube of space there could be no recovery. The trial court accordingly adopted the view that even if there was a nuisance, a nuisance could not give rise to a taking.

This appeal requires us to decide whether, under the circumstances of this case, the landowner has a right to have the jury pass upon his claim. If we so hold, then we have necessarily decided that the owner's interest in the use of his land free from the inconvenience of noise coming in upon him from outside his boundaries is an interest for the taking of which the government must pay. It would, of course, remain for the jury, under proper instructions, to decide when such a taking has occurred.

There is no doubt that noise can be a nuisance. See cases collected in Annotation, 44 ALR2d 1381, 1394 (1953) (dance halls); Lloyd, *Noise As a Nuisance*, 82 Pa L Rev 567 (1934); de Funiak, *Equitable Relief Against Nuisances*, 38 Ky L J 223 (1949); and Notes, 15 Or L Rev 268 (1936). At common law, one could obtain a prescriptive right to impose an unreasonable noise upon one's neighbor, and hence an

easement for a nuisance. *Sturges v. Bridgman,* LR 11 Ch D 852 (1879); Restatement, Property, § 451, Comment *a.* (The authorities do not all agree about when the prescriptive period begins to run,[9] but that problem is not before us now.) It is clear that freedom from unreasonable noise is a right which, in a proper case, the law will protect. On similar principles, offensive smells are treated as nuisances for which a remedy will lie. See cases collected in Annotation, 18 ALR2d 1033 (1950) (slaughterhouse). It is equally clear that a reasonable volume of noise (like a reasonable olfactory insult from industrial odors) must be endured as the price of living in a modern industrial society. See generally Restatement, Torts, §§ 822-831. Freedom from noise can be a legally protected right.

■ We come then to the facts of the case at bar. At the outset the parties concede that because of the wording of the Oregon Constitution, Art I, § 18 (eminent domain), a plaintiff aggrieved by a public activity must show that there has been a taking of his property. There must be more than merely the suffering of some damage. See, e.g., *Moeller et ux v. Multnomah County,* 218 Or 413, 424, 430, 345 P2d 813 (1959) (See Note, 40 Or L Rev 241 (1961)); *Tomasek v. Oregon Highway Com'n,* supra note 1.

■ A taking within the meaning of Oregon Constitu-

---

[9] Where a slaughterhouse had maintained a stench for 20 years, held: it had acquired a prescriptive right to continue the nuisance. Dana v. Valentine, 5 Metc 8, 46 Mass 8 (1842). See other cases collected in Annotation, 152 ALR 343 (1944), and notes, 13 Harv L Rev 142 (1899); 21 Notre Dame Lawyer 358 (1946); 2 Wash & Lee L Rev 159 (1940). The Oregon Court has recognized (dictum) that a prescriptive right to maintain a private nuisance could be created by continuous conduct for the statutory time, although the case under study involved a trespassory invasion (drainage). Laurance et al. v. Tucker, 160 Or 474, 85 P2d 374 (1939).

tion, Art I, § 18, has been defined as "any destruction, restriction or interruption of the common and necessary use and enjoyment of the property of a person for a public purpose * * *." *Morrison v. Clackamas County,* 141 Or 564, 568, 18 P2d 814 (1933). See Note, 16 Or L Rev 155 (1937). The definition from *Morrison v. Clackamas County,* supra, is broad enough to cover a continuing nuisance, and hence the plaintiffs' case, unless there is some policy reason for limiting its application.

■ Since *United States v. Causby,* 328 US 256, 66 S Ct 1062, 90 L Ed 1206 (1946), and particularly since *Griggs v. Allegheny County,* 369 US 84, 82 S Ct 531, 7 L Ed2d 585 (1962), we know that easements can be taken by repeated low-level flights over private land. Such easements have been found in actions against the federal government (*Causby*) and in actions against municipal corporations (*Griggs*). When such easements are said to have been taken, compensation must be paid to the owners of the lands thus burdened. This much appears to be settled.

It is not so well settled, however, that the easements discussed in the *Causby* and *Griggs* cases are easements to impose upon lands near an airport a servitude of noise. Courts operating upon the theory that repeated trespasses form the basis of the easement have not found it necessary to decide whether a repeated nuisance, which may or may not have been an accompaniment of a trespass, could equally give rise to a servitude upon neighboring land. It must be remembered that in both the *Causby* and *Griggs* cases the flights were virtually at tree-top level. Accordingly, both decisions could perhaps be supported on trespass theories exclusively. Following the *Causby* case, several federal district courts held that while

repeated flights at low levels directly over private land may amount to a taking for which compensation must be paid, repeated flights nearby but not directly overhead must be endured as mere "damages" which, for various reasons, may not be compensable. See, e.g., *Moore v. United States,* 185 F Supp 399 (ND Tex 1960); *Freeman v. United States,* 167 F Supp 541 (WD Okla 1958); and see *Cheskov v. Port of Seattle,* 55 Wash2d 416, 348 P2d 673 (1960), where the court found no taking, but held that damages might be recoverable in a proper case under the Washington constitution.[4]

After the case at bar had been argued and submitted, the United States Court of Appeals for the Tenth Circuit, which had previously held in *Batten v. United States,* 292 F2d 144 (10th Cir 1961), that a complaint sounding substantially in nuisance stated a cause of action under circumstances very like those now before us, held, on the merits in the same case, that the interference with the use and enjoyment of the land complained of was a consequential damage not amounting to a taking, and adopted the rule that there must be a trespass before there can be a taking. *Batten v. United States,* 306 F2d 580 (10th Cir 1962). As pointed out in a dissent by Murrah, Chief Judge, the interference proven was substantial enough to

---

[4] Unlike ours, the constitutions of several states permit the recovery of compensation for property "taken or damaged" for a public purpose. The significance of these constitutional provisions was fully discussed in Moeller v. Multnomah County, supra. Compare Oregon Constitution, Art I, § 18, and Washington Constitution, Art I, § 16. See also Tomasek v. Oregon Highway Com'n, supra note 1; Metzger v. City of Gresham, 152 Or 682, 54 P2d 311 (1936); Morrison v. Clackamas County, supra. Compare Levene et ux. v. City of Salem, 191 Or 182, 197, 229 P2d 255 (1951), where we talked as if a trespass could be either a "mere nuisance" (presumably a noncompensable one) or a "taking".

impose a servitude upon the lands of the plaintiffs, and under the *Causby* and *Griggs* cases equally could have constituted a taking. 306 F2d at 585. In view of the importance of the question presented in the *Batten* case, and in view of the strong dissent by the chief judge, it would be premature to speculate now upon the final direction the federal courts will take. We believe the dissenting view in the *Batten* case presents the better-reasoned analysis of the legal principles involved, and that if the majority view in the *Batten* case can be defended it must be defended frankly upon the ground that considerations of public policy justify the result: i.e., that private rights must yield to public convenience in this class of cases. The rationale of the case is circular. The majority said in effect that there is no taking because the damages are consequential, and the damages are consequential because there is no taking.

As we noted in a recent case which involved a different aspect of the airport problem,[5] some of the decisions reveal internal ambivalence with reference to the theory upon which they proceed. In perhaps the leading case, *United States v. Causby,* supra, the court used language appropriate to the law of trespass more or less interchangeably with language appropriate to the law of nuisance.[6] It appears that

---

[5] Atkinson et al v. Bernard, Inc., 223 Or 624, 355 P2d 229 (1960).

[6] The case says that the landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land, and that the landowner as an incident of ownership has a claim to it and invasions of it are in the same category as invasions of the surface. 328 US at 264, 265. In the same opinion, the court also says that "[f]lights over private land are not a taking unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land * * * ." 328 US at 266. The commingling of trespass and nuisance language has been noted elsewhere. See 51 Northw U L Rev 346 (1962).

the majority in the *Batten* case accepted the rule that only a trespass in the airspace directly overhead can give rise to an action for a taking, and that nuisance principles ought not to be applied in actions against the government. This may be a cogent policy argument, but it does violence to the law of servitudes.

The fact that the defendant in the case at bar is a governmental agency is of obvious importance, but, before we can decide whether to adopt one rule for governmental defendants and another for private parties, we need to know what the alternatives are. We need to know what the constitutional protection of private property means when balanced against those policy considerations which arise out of the governmental character of the defendant. In other words, as is frequently the case, we must balance apparently conflicting principles before we can tell whether or not this particular case is one for the jury.

While not every wrong committed by government will amount to a taking of private property, there are some wrongs which do constitute a taking. See, e.g., *Cereghino et al v. State Hwy. Com.*, 230 Or 439, 370 P2d 694 (1962), and *Moeller et ux v. Multnomah County*, supra. Many of these wrongs involve trespassory activities. The inquiry must not beg the question, however, whether a nuisance can also amount to a taking. Whether a nuisance has, in fact, produced the results alleged by the plaintiff in this case is another matter; first we must decide whether a nuisance can ever constitute a taking. If there is a taking, then what is taken must be paid for. *Armstrong v. United States*, 364 US 40, 48, 80 S Ct 1563, 4 L Ed2d 1554 (1960). And see Annotation, 84 ALR 2d 348, *Eminent Domain—View—Interference* (1962).

■ The subject matter of inverse condemnation is always private property. Narrowed down to a meaningful definition for the purposes of this case, however, the only "property" right of the possessor of land which has any value is his ability to use and enjoy his land. This is true whatever estate the possessor holds, whether in fee, or for life, or for years, or merely an incorporeal interest such as an easement or profit. See *Ackerman v. Port of Seattle*, 55 Wash2d 400, 348 P2d 664, 77 ALR2d 1344 (1960). If the government substantially deprives the owner of the use of his land, such deprivation is a taking for which the government must pay.[7] *Cereghino et al v. State Hwy. Com.*, supra; *Ackerman v. Port of Seattle*, supra. If, on the other hand, the government merely commits some tort which does not deprive the owner of the use of his land, then there is no taking.[8]

---

[7] Iron Works v. O. R. & N. Co., 26 Or 224, 37 P 1016, 29 LRA 88 (1894); McQuaid v. Portland & V. R'y Co., 18 Or 237, 22 P 899 (1889). See also Kurtz v. Southern Pacific, 80 Or 213, 155 P 367, 156 P 794 (1916). Cf. Brand v. Multnomah County, 38 Or 79, 60 P 390, 62 P 209, 50 LRA 389 (1900).

[8] The general rule is thus stated by Nichols:

"* * * [W]hen a municipal or a public service corporation, or other party to whom the power of eminent domain can be constitutionally delegated, inflicts injury upon private land under authority of and in compliance with an act of the legislature, and there has been no want of reasonable care or skill in the execution of the power, such party is not liable in an action at law for such injury, even though the same act if done without legislative sanction would be actionable, unless the injury is of such a character as to deprive the owner of the use and possession of his land, or compensation is required by special statutory or constitutional provision whenever property is damaged by the construction of a public improvement [citing cases]." 2 Nichols, Eminent Domain 293, § 6.38 (1).

See also 4 Nichols, Eminent Domain 476, § 14.1 (1), and cases collected in the annotation thereto.

■ Therefore, unless there is some reason of public policy which bars compensation in cases of governmental nuisance as a matter of law, there is a question, in each case, as a matter of fact, whether or not the governmental activity complained of has resulted in so substantial an interference with use and enjoyment of one's land as to amount to a taking of private property for public use. This factual question, again barring some rule which says we may not ask it, is equally relevant whether the taking is trespassory or by a nuisance. A nuisance can be such an invasion of the rights of a possessor as to amount to a taking, in theory at least, any time a possessor is in fact ousted from the enjoyment of his land.

It now becomes relevant to consider whether a jury ought to be permitted to find that a given nuisance is so aggravated as to be a taking when the perpetrator of the nuisance happens to be the government. The Port argues that the plight of the plaintiffs in this case is indistinguishable from that of thousands of their fellow countrymen whose homes abut highways and railroads and who endure the noise without complaint. Granting the similarity, it must be noted, however, that the matter is one of degree.⑨ We do not decide that the positions of the parties are the same. The Port points to our previous decisions in support of the proposition that nuisance (nontrespassory) invasions by government are not compensable. The cases cited by the Port did not, however, hold that a nuisance so aggravated as to amount to a complete ouster or deprivation of the beneficial use of property was not a taking. That

---

⑨ "* * * The law is not indifferent to considerations of degree." Cardozo, J., concurring in Schechter Corp. v. United States, 295 US 495, 554, 55 S Ct 837, 79 L Ed 1570, 97 ALR 947.

question does not appear to have been passed upon by our court. But cf. *Wilson v. City of Portland,* 132 Or 509, 514, 285 P 1030 (1930), where there is *dictum* to the effect that nontrespassory incursions give rise to no liability. There are cases elsewhere which tend to support the Port's theory that nuisances, when committed by government, are "legal" and therefore can never be a taking in the constitutional sense, but must always be endured with fortitude. Indeed, some authorities hold that the king can do no wrong and that the government never perpetrates a nuisance. See cases noted in 66 CJS, Nuisances 761, § 17. Again "lawful" nuisances have been held to be of such public desirability (utility) that only those portions of the invasion that could be severed from the whole and characterized as trespass could be considered in an action for damages. See, e.g., *Richards v. Washington Terminal Co.,* 233 US 546, 34 S Ct 654, 58 L Ed 1088, LRA 1915A 887 (1914), holding that railroad noises and smoke (but not soot) must be endured where the conduct that created the nuisance is in the public interest and has been encouraged by law. The reason for assigning mystical power to trespass *quare clausum fregit* is elusive. But *Richards v. Washington Terminal Co.* did not say that the public interest demands that all governmentally approved activities (except trespass) be endured without compensation. We have found no case which goes that far, and we doubt that the constitutional right to compensation can be so construed.

■ The plaintiffs concede that single-instance torts, as torts, are not compensable. Inverse condemnation, however, provides the remedy where an injunction would not be in the public interest, and where the continued interference amounts to a taking for which

the constitution demands a remedy. In summary, a taking occurs whenever government acts in such a way as substantially to deprive an owner of the useful possession of that which he owns, either by repeated trespasses or by repeated nontrespassory invasions called "nuisance". If reparations are to be denied, they should be denied for reasons of policy which are themselves strong enough to counterbalance the constitutional demand that reparations be paid. None has been pointed out to us in this case.

■■■ If we accept, as we must upon established principles of the law of servitudes, the validity of the propositions that a noise can be a nuisance; that a nuisance can give rise to an easement; and that a noise coming straight down from above one's land can ripen into a taking if it is persistent enough and aggravated enough, then logically the same kind and degree of interference with the use and enjoyment of one's land can also be a taking even though the noise vector may come from some direction other than the perpendicular.

If a landowner has a right to be free from unreasonable interference caused by noise, as we hold that he has, then when does the noise burden become so unreasonable that the government must pay for the privilege of being permitted to continue to make the noise? Logically, the answer has to be given by the trier of fact (subject to the usual exercise of the proper function of the court in screening the evidence). See Restatement, Torts, § 826, Comment *d*. It may be contended that the jury is an imperfect instrument in these cases, but such an argument raises constitutional and legislative questions that are not now before us. See *Holden v. Pioneer Broadcasting Co.*, 228 Or 405, 365 P2d 845.

While it is no doubt anticipatory to advert to the problem of instructing the jury in cases of this kind, it is relevant to point out that the nuisance theory provides the jury a useful method for balancing the gravity of the harm to the plaintiff against the social utility of the airport's conduct, in a way that would not be available if the trespass theory were used. In Restatement, Torts, §§ 826-831, we find principles for balancing gravity against utility which can be adapted to jury instruction so that the question of reasonableness need not be any more mysterious to the jury in this type of case than it is in an automobile accident case. The balancing of private rights and public necessity is not a novel problem.[®]

Whether expressed in so many words or not, the principle found in the *Causby, Griggs* and *Ackerman* cases is that when the government conducts an activity upon its own land which, after balancing the question of reasonableness, is sufficiently disturbing to the use and enjoyment of neighboring lands to amount to a taking thereof, then the public, and not the subservient landowner, should bear the cost of such public benefit. Under this principle, it was error to exclude the plaintiffs' proffered testimony concerning the jet flights near his land. The real question was not one of perpendicular extension of surface boundaries into the airspace, but a question of

---

[®] See Madison v. Copper Co. [Madison v. Ducktown Sulphur Copper & Iron Co.], supra, where damages were allowed and the injunction was refused. And see the related case of State of Georgia v. Tennessee Copper Co., 206 US 230, 27 S Ct 618, 51 L Ed 1038, 11 Ann Cas 488 (1907), 237 US 474, 35 S Ct 631, 59 L Ed 1054 (1915), 240 US 650, 36 S Ct 465, 60 L Ed 846 (1916). Similar considerations are discussed in Booth-Kelly Lumber Co. v. Eugene, 67 Or 381, 136 P 29 (1913) and York et ux v. Stallings et al, 217 Or 13, 341 P2d 529 (1959).

reasonableness based upon nuisance theories.⑪ In
effect, the inquiry should have been whether the gov-
ernment had undertaken a course of conduct on its
own land which, in simple fairness to its neighbors,
required it to obtain more land so that the substan-
tial burdens of the activity would fall upon public
land, rather than upon that of involuntary contribu-
tors who happen to lie in the path of progress.

■ As noted above, this court has expressed a
policy against allowing compensation in several situa-
tions where there was no actual physical injury to the
real property. The cases used terms such as "conse-
quential damages",⑫ or "damages which do not amount
to a 'taking' ",⑬ or "*damnum absque injuria.*"⑭ Such
expressions describe conclusions that the court reached
when it had decided that the facts involved did not
measure up to the standard necessary for a "taking".
Such injuries were then held to be noncompensable as a
matter of law, under the policy against allowing com-
pensation for mere "damages". Such decisions, which
were no doubt right in cases of single-instance wrongs,
prove too much when applied to continuing and sub-
stantial interference with the use and enjoyment of
property. Ordinarily, in a case of a continuing inter-

---

⑪ See Kellogg v. Mertens, (La App) 30 S2d 777 (1947), and
cases discussed in Amphitheaters, Inc. v. Portland Meadows, 184
Or 336, 198 P2d 847, 5 ALR2d 690 (1948), where the plaintiffs
sought damages at law for a nuisance from excessive lights. And
see York et ux v. Stallings et al, supra note 10 (injunction
denied); and Note, *Airplane Noise: Problem in Tort Law and
Federalism*, 74 Harv L Rev 1581 (1961). Cf. Antonik v. Chamber-
lain, 81 Ohio App 465, 475, 477, 78 NE2d 752 (1947).

⑫ Brand v. Multnomah County, 38 Or at 92.

⑬ Moeller et ux v. Multnomah County, 218 Or supra, at 427.

⑭ Barrett et al. v. Union Bridge Co., (on merits) 117 Or 220,
243 P 93, 45 ALR 521, (on petition for rehearing) 117 Or 566, 578,
245 P 308, 45 ALR 527 (1926), quoting with approval Less v.
City of Butte, 28 Mont 27, 31, 72 P 140, 98 Am St Rep 545, 61
LRA 601 (1903).

ference, whether it is substantial enough to constitute a taking will be for the jury to determine.

Another assignment of error in the case at bar challenges the failure of the court to give a requested instruction with respect to low-level flights directly over plaintiffs' land.[15] The court instead instructed the jury that only such flights as were conducted over the land at altitudes of less than 500 feet could constitute a taking.[16]

The challenged instruction requires us to decide when, if ever, an airport can be liable for taking property because it permits flights to and from it over private land, but within "navigable airspace". On this point, there is no doubt that a taking of private property can occur even though the flights are within navigable airspace as defined by law if the flights are below 500 feet. *Matson v. United States,* 171 F Supp 283 (Ct Cl 1959), held that the plaintiff should recover for a taking, even though the court recognized that the taking was accomplished in what

---

[15] Requested:

"If you find from the evidence in this case that there have been flights of airplanes over plaintiffs' property originating from and going into the defendant airport during the period complained of in plaintiffs' second amended complaint, and if you further find that such flights were at such a low altitude and at such a frequency over plaintiffs' property as to be a direct and an immediate interference with the use and enjoyment thereof, then I instruct you that said interference would constitute a partial taking of the plaintiffs' property under the Constitution of the United States and the State of Oregon."

[16] Given:

"* * * I instruct you that under the law, if you find that the aircraft which may have flown over the plaintiffs' property during the period complained of were flown at heights of five hundred feet or greater above the property, such flights are within the navigable airspace and cannot be made the basis of any recovery for the plaintiffs here and your verdict must be for the defendant."

today would be navigable airspace.[17] *Griggs v. Allegheny County,* supra, is a square holding that taking of private property can be accomplished by planes taking off and landing within navigable airspace. 369 US 84, 82 S Ct 531, 533, 7 L Ed2d 585, 588. There is, therefore, no merit in the defense argument that all flights within the navigable airspace are automatically free from liability.[18] The debate centers on the legal effect of the 500-foot rule.

The Port's argument that flights above 500 feet are immune from private litigation seems to be based on two grounds:

(1) As a result of the legislation by Congress in denominating navigable airspace and declaring a public right of transit through it, the landowner cannot claim there has been a "trespass" through a column of air which he does not own.[19] Ownership of the navigable airspace is said to be in the public.[20]

---

[17] In Matson v. United States, supra, the court said:

"* * * We do not think, however, that the change in the definition of navigable airspace affects plaintiffs' causes of action. The Government's easement over plaintiffs' property may be perpetual. Although today navigable airspace with its public rights of transit * * * includes the glide, its use by the United States or other aeroplane operators at heights below the minimum altitudes of flight except where necessary for take-off or landing, may require compensation * * *." 171 F Supp at 285.

[18] Since navigable airspace now includes both the cruising altitudes and the space needed for the glide, it is meaningless to say that flights in the navigable airspace cannot constitute a servitude on land. It is necessary to know how the flights affect the land. See Griggs v. Allegheny County, supra.

[19] Title 49, USC (1952):

§ 176 (a). "The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace above the United States * * *."

§ 403. "There is recognized and declared to exist in behalf of any citizen of the United States a public right of freedom

(2) As a result of the same legislation, the landowner is in a position analogous to that of a person abutting a highway or a railroad right-of-way who must be content with the incidental inconveniences that are unavoidably attendant upon those operations.[20]

The instruction given below forces a choice between consistency, which is on the side of the plaintiffs, and public convenience, which is on the side of the Port. Logically, it makes no difference to a plaintiff disturbed in the use of his property whether the disturbing flights pass 501 feet or 499 feet above his land. If he is in fact ousted from the legitimate enjoyment of his land, it is to him an academic matter that the planes which have ousted him did not fly below 500 feet.[22] The rule adopted by the majority of the state

of transit in air commerce through the navigable airspace of the United States."

§ 180. "As used in sections 171, 174-177, and 179-184 of this title, the term 'navigable airspace' means airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority, and such navigable airspace shall be subject to a public right of freedom of interstate and foreign air navigation in conformity with the requirements of said sections."

[20] We need not here consider whether such ownership of the airspace is in the United States or in the individual states. See 57 Mich L Rev 1214, 1223 (1959).

[21] Brand v. Multnomah County, supra note 7; Richards v. Washington Terminal Co., 233 US 546, supra; and Matson v. United States, 171 F Supp 283, supra.

[22] See 14 J Air L & Com 112, 116, discussing a decision to the effect that "[t]he height at which an airplane operator may pass above the surface without trespassing is a question depending for solution on the facts in the particular case, and this question is unaffected by the regulations promulgated by the Department of Commerce, under the Air Commerce Act of 1926 * * *." Cory v. Physical Culture Hotel, 14 F Supp 977, 982 (WD NY 1936). In any event, unless experts, equipped with the necessary instruments, have measured each flight, it is highly unlikely that trustworthy evidence would be produced to prove the exact altitude of flights over private land.

and federal courts is, then, an arbitrary one. The barring of actions when the flights are above 500 feet is also difficult to reconcile with the theory that recovery should be based upon nuisance concepts rather than upon the trespass theory which we have rejected. Whether a plaintiff is entitled to recover should depend upon the fact of a taking, and not upon an arbitrary rule. The ultimate question is whether there was a sufficient interference with the landowner's use and enjoyment to be a taking.

It is sterile formality to say that the government takes an easement in private property when it repeatedly sends aircraft directly over the land at altitudes so low as to render the land unusable by its owner, but does not take an easement when it sends aircraft a few feet to the right or left of the perpendicular boundaries (thereby rendering the same land equally unusable). The line on the ground which marks the landowner's right to deflect surface invaders has no particular relevance when the invasion is a noise nuisance. Neither is a 500-foot ceiling relevant, desirable though it may be as an administrative device. If the interest to be protected is worth protecting at all, it is necessary to employ a system of rules that will meet the problem. Whatever virtue the establishment of a 500-foot floor under the cruising flight of aircraft may have as a matter of public safety, there can be only one sound reason to make it a rule of the law of real property. That reason ought to be the knowledge, derived from factual data, that flights above 500 feet do not disturb the ordinary, reasonable landowner. This may be true. We do not know that it is. It may well be that only the most sensitive are offended by such flights. It may equally be true that some of the aircraft now in use are so disturbing to those on the ground that 500 feet

of air will not provide protection to the landowner below. We are not justified in adopting the 500-foot rule as a rule of property law in cases of this character merely because to do so might make our work easier. The trier of fact in each case is best able to work out the solution. The difficulty was foreseen in the *Causby* case.[20] Congress may very properly declare certain airspace to be in the public domain for navigational purposes, but it does not necessarily follow that rights of navigation may be exercised unreasonably. The power to invade the rights of servient landowners no doubt reposes in the federal government, but there is a point beyond which such power may not be exercised without compensation. *United States v. Causby,* supra. The same limitation applies to lesser governmental agencies.[21] See *Griggs v. Allegheny County,* supra.

Unfortunately for trial judges trying to formulate instructions for juries, the cases have not dealt with the instructions to be given to the laymen who must

---

[20] "The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amendment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. We need not speculate on that phase of the present case. For the findings of the Court of Claims plainly establish that there was a diminution in value of the property and that the frequent, low-level flights were the direct and immediate cause. We agree with the Court of Claims that a servitude has been imposed upon the land." United States v. Causby, supra at 266, 267.

[21] The question of who, under the current Federal definition of navigable airspace, ought to be liable for the taking is discussed in Comment, 57 Mich L Rev, 1214, 1225 (1959), and the possibility is suggested that suits could be brought against the United States. See also Harvey, *Landowners' Rights in the Air Age: The Airport Dilemma,* 56 Mich L Rev 1313, 1326 (1958).

work out the answer under Oregon law. In submitting to a jury a case such as we have before us, the trial court is confronted with the need to verbalize rules as abstract as any to be found in the law, but, as we have said before,[39] the ingenuity of trial judges in formulating meaningful instructions to juries is usually equal to the task.

The idea that must be expressed to the jury is that before the plaintiff may recover for a taking of his property he must show by the necessary proof that the activities of the government are unreasonably interfering with his use of his property, and in so substantial a way as to deprive him of the practical enjoyment of his land. This loss must then be translated factually by the jury into a reduction in the market value of the land.

We cannot say, as a matter of law, that jet or rocket or some other kind of noise within 500 feet, or within some other number of feet, of private land might not in a particular case cause a taking for public use. The question in each case must be decided by an appropriate tribunal. Our present constitution places this duty upon the jury. If the jury proves unequal to the task, that, as noted above, is a legislative problem. If the case should arise when it is claimed that insufficient evidence was placed before the jury to support a verdict, then will be time enough to pass upon the amount of evidence necessary to get to the jury. In the case at bar, much of the evidence was excluded. As we have noted, this exclusion was error.

Other assignments of error challenge various rulings which were made in a logical and consistent

[39] Williamson v. McKenna, 223 Or 366, 401, 354 P2d 56 (1960).

pattern which followed from the able trial court's view of the case as one controlled essentially by trespass concepts. On another trial, these rulings are not likely to be repeated, and need not detain us further now.

Reversed and remanded.

PERRY, J., dissenting.

I am unable to agree with the majority's views of the law of eminent domain. It should be noted that to reach a reversal of the judgment of the trial court, the majority rely upon the law of nuisance. The majority seem to admit that this has never been the law of this state, but argue that it should be. So far as I have been able to ascertain, no jurisdiction whose constitution reads as does ours has ever sustained such a proposition.

In substance, plaintiffs' assignments of error are, (1) the trial court refused to submit to the jury as evidence of a taking, evidence that airplanes did travel directly over the property owned by plaintiffs at a height of more than 500 feet, and (2) the trial court refused to submit to the jury evidence of airplane flights which do not travel over the plaintiffs' property but over property adjacent thereto. It is these adjacent flights which, if considered, must rest solely upon the law of nuisance.

Considering first the issue of flights above the 500-foot level, I am of the opinion that such flights may be considered in determining whether there has been a "taking" in the constitutional sense.

In the case of *United States v. Causby*, 328 US 256, 66 S Ct 1062, 90 L Ed 1206, the rule of law was established that ownership in land could not be considered in this space age as extending upward "to

the periphery of the universe" and that therefore Congress had the authority to declare that all navigable airspace above our land was a part of the public domain.

Congress had defined navigable airspace as that airspace above the minimum safe altitude of flight as prescribed by the Civil Aeronautics Authority. As applied to the matter before us, the minimum airspace established for safety is 500 feet. At first blush it would appear that all airspace above the 500-foot level of the plaintiffs' property, being within the public domain, plaintiffs would have no proprietary interest therein which could be taken, but I do not believe this conclusion can be sustained.

Subsequent to the determination of *United States v. Causby,* supra, the Civil Aeronautics Authority included in its determination of airspace the glide path and the take-off path to and from the 500-foot level to the airport. *Griggs v. Allegheny County,* 369 US 84, 82 S Ct 531. The Supreme Court of the United States, in considering the effect of this additional regulation within the scope of the national airport plan, provided in 49 USCA, Section 1101, et seq., stated that private ownership in land "presupposes" the use of some of the airspace above. The court therefore held there was a constitutional taking of an air easement over the plaintiff's property line directly in the glide and ascent path of the planes.

From this latter case it appears that the power of Congress to establish a navigable airspace as public domain may not authorize a trespass above the owner's property, if, as a consequence thereof, there is injury to the owner's reasonable use and enjoyment of his land.

It seems to me this is a proper rule to balance public and private interests arising from the abolishment of the common-law rule that ownership in land extended upward to the periphery of the universe, therefore, where the flight directly over the land, by reason of noise and vibration, can be said in fact to cause serious interference in the owner's use and enjoyment of the property, it is a trespass, which is a constitutional taking, and requires full compensation.

In the matter before us, however, after searching the record, I am unable to find any evidence that would support a judgment of a taking, based on interference with the plaintiffs' use and enjoyment of the land by airplane flights above the 500-foot level. Therefore, in my opinion, the trial court did not err in refusing to submit this issue to the jury.

Turning now to the issue presented as to whether the flights over the lands of adjacent owners, which create a noise nuisance, can constitute a taking of the plaintiffs' property in a constitutional sense.

So far as material, our constitution, which provides for just compensation for property taken, reads as follows:

> "Private property shall not be taken for public use, * * * without just compensation; * * *." Art I, § 18.

In the recent case of *Cereghino v. State,* 230 Or 439, 370 P2d 694, a case of inverse condemnation, this court pointed out that the taking of property in the constitutional sense was the taking of all or a part of an individual's possessory right in the property, not just interference with its use and enjoyment. The court stated:

> "The Fifth Amendment of the Constitution of

the United States and Article I, Section 18, of the Oregon Constitution are identical in language and meaning. The word 'property' in these provisions is not 'used in its vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law,' but 'to denote the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it.' United States v. General Motors Corp., 323 U.S. 373, 377-378, 65 S.Ct. 357, 359, 89 L.Ed. 311, 156 A.L.R. 390. When the sovereign exercises the power of eminent domain 'it deals with what lawyers term the individual's "interest" in the thing in question. That interest may comprise the group of rights for which the shorthand term is "a fee simple" or it may be an interest known as an "estate or tenancy for years", as in the present instance.' Ibid. See 1 Lewis, Eminent Domain (3d ed.) §§ 63, 64. Or it may be such a right as is involved in this case."

That this same rule as to a constitutional taking in an inverse condemnation suit is adhered to by the United States is found in *United States v. Causby,* supra. In that case government planes (heavy bombers) were flown at an elevation of approximately 87 feet directly over the Causby property as they took off and returned to the airfield. The court stated:

"* * * If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it.

"We agree that in those circumstances there would be a taking. *Though it would be only an easement of flight which was taken, that easement,* if permanent and not merely temporary, normally would be the equivalent of a *fee interest.* It would

be a definite exercise of complete dominion and control *over the surface of the land.* The fact that the planes never touched the surface would be as irrelevant as the absence in this day of the feudal livery of seisin on the transfer of real estate. The owner's right to possess and exploit the land— that is to say, his beneficial ownership of it— would be destroyed. It would not be a case of incidental damages arising from a legalized nuisance such as was involved in Richards v. Washington Terminal Co., 233 U.S. 546. In that case property owners whose lands adjoined a railroad line were denied recovery for damages resulting from the noise, vibrations, smoke and the like incidental to the operations of the trains. *In the supposed case, the line of flight is over the land. And the land is appropriated as directly and completely as if it were used for the runways themselves.*" (Emphasis mine.)

Again, that there may be no question of the rule of law, the court remanded the case for an accurate description of the easement taken. To the same effect is the recent case of *Griggs v. Allegheny County,* supra.

That the definition of a constitutional taking has consistently been grounded in the appropriation of an interest in the realty itself has been a rule of law of long standing under the Constitution of the United States is shown by the case of *Portsmouth Harbor L. & H. Co. v. United States,* 260 US 372, 43 S Ct 135. In this case damages were sought in inverse condemnation because of the establishment of a fort in which there were gun emplacements and shells were fired over and across the plaintiff's land. Mr. Justice Holmes, speaking for the court, said: "This is a claim in respect of land which, *or an interest in*

*which,* is alleged to have been taken by the United States government. * * *" (Italics mine.)

This court has always recognized and maintained this distinction between the loss of a proprietary right and damage in inverse condemnation proceedings. This is borne out by the cases cited by the majority.

In *Iron Works v. O.R. & N. Co.,* 26 Or 224, 37 P 1016, this court carefully pointed out that the owner of property adjacent to a street has a proprietary interest in the street. And thus having a proprietary interest, this interest cannot be taken without just compensation.

This same thought is carried out in the case of *McQuaid v. Portland & V. R'y. Co.,* 18 Or 237, 22 P 899, and to show that the court had in mind the distinction between a constitutional taking for which compensation must be paid and the creation of a nuisance which does not require compensation, I quote:

> "* * * The latter will, doubtless, be obliged to submit to the ordinary inconveniences and consequences which the construction of a railroad track, and the moving of a locomotive and cars thereon, occasion—be compelled to endure the smoke, noise, and screeching which naturally result from the use of that character of vehicles; but they cannot be deprived of the right of ingress and egress to and from their premises without compensation. * * *"

In *Brand v. Multnomah County,* 38 Or 79, 60 P 390, 62 P 209, 50 LRA 389, also cited, the court simply held that a change of grade in a street did not create an additional servitude upon an abutting owner's interest in the street. This case has no application to the matter at hand.

In *Kurtz v. Southern Pacific Co.*, 80 Or 213, 155 P 367, 156 P 794, also cited, the basis of relief in the original opinion of the court is somewhat obscure, but no doubt is left in the opinion on rehearing. The relief of injunction was granted upon the fact that there had been no prior purchase or condemnation of the owner's proprietary interest in the land, "an easement of ingress and egress," the court stating:

> "The evidence discloses that the spur track of which complaint is made is a special injury affecting no other property owner than plaintiff, that it will materially and premanently [sic] affect his ingress and egress to and from his lots, and consequently his property rights are invaded in a manner which can only be lawfully done by compromise or condemnation."

Not a single Oregon case will support the theory that a mere nuisance can be considered a taking, as provided in our constitution, nor does any other jurisdiction where the language of the constitution is similar to ours hold that a mere nuisance can be considered a taking, nor does the majority cite any case so holding. The reason for this is fundamental. The law of trespass and nuisance is based upon different concepts of social justice.

A nuisance, although a tort, does not contemplate a physical invasion of the property of another, but the use of a person's own property in such a way as to interfere with another's free enjoyment of his property.

> "A nuisance, in the ordinary sense in which the word is used, is any thing that produces an annoyance—any thing that disturbs one or is offensive; but in legal phraseology it is applied to that class of wrongs that arise from the unreasonable, unwarrantable or unlawful use by a person of his

own property, real or personal, or from his own improper, indecent or unlawful personal conduct, working an obstruction of, or injury to, a right of another or of the public, and producing such material annoyance, inconvenience, discomfort or hurt, that the law will presume a consequent damage. * * *." 1 Wood on Nuisances, 3d Ed, § 1, page 1.

While a nuisance may cause as much damage to a person's enjoyment of the use of his property as a trespass, this does not mean that because an individual has suffered a damage, this damage requires compensation by the public.

"It goes without saying that the courts have never construed the 'just compensation' clause of a federal or state constitution as requiring payment for all injuries imposed upon persons or property by acts of government. Any such requirement would make government itself impossible. No legislature can enact an important statute which does not directly or indirectly impose a material loss on some property owners. The imposition of a tax, the establishment of a new banking system or currency reform, the enactment of a new protective tariff, will often inflict losses on many private citizens far in excess of the total loss imposed by the most drastic act of condemnation in the history of the world. Yet no compensation for these losses is required." 1 Orgal on Valuation Under Eminent Domain, 2d Ed, § 1, page 5.

Governmental acts may be detrimental to the personal interests of adjoining land owners, but this does not constitute a taking.

"Sanitary Dist. v. Johnson, 343 Ill, 11, 174 N.E. 862 (1931) (sewage reduction plant); Winchester v. Ring, 312 Ill. 544, 144 N.E. 333, 36 A.L.R. 520 (1924) (cemetery); Schuler v. Wilson 322 Ill, 503, 153 N.E. 737, 48 A.L.R. 1027 (1926) (school);

Frazer v. Chicago, 186 Ill. 480, 57 N.E. 1055, 51 L.R.A. 306 (1900) (smallpox hospital); Mayfield v. Board of Education, 118 Kan. 138, 233 Pac. 1024 (1925) (school); Barry v. Smith, 191 Mass. 78, 77 N.E. 1099, 5 L.R.A. (N.S.) 1028 (1906) (contagious disease hospital). In Conger v. Pierce County, 116 Wash. 27, 198 Pac. 377, 18 A.L.R. 393 (1921) the court said: 'Private property may be damaged, and its value lessened because it is located close to some public building, such as a jail, or hospital, or public hall, yet such damage is purely incidental and not recoverable. The noise consequent on the operation of railroad trains upon a private right of way may depreciate the value of adjoining private property, and be an annoyance to those living in the immediate neighborhood, but such damage is purely consequential and is not recoverable.'" 1 Orgal on Valuation Under Eminent Domain, 2d ed, § 1, page 6.

Practically all human activities engaged in carrying out a commercial enterprise may interfere with someone's enjoyment of his property. It is the right of an owner of land to use his land in any lawful manner, and it is only when the manner of use creates a grave interference with another's enjoyment of his property that the law will seek to redress this type of wrong. This is a natural requirement of organized society. There must be some give and take to promote the well-being of all. The underlying basis in nuisance law is the common-sense thought that in organized society there must be an adjustment between reasonable use and personal discomfort. No such consideration is involved in the law of trespass.

Trespass of property which, as has been pointed out, effects a taking in a constitutional sense, comprehends a physical invasion of the property either by the person or by causing a physical object to enter

upon or over the property of another. *Martin et ux. v. Reynolds Metal Co.,* 221 Or 86, 342 P2d 790.

> "One who intentionally and without a consensual or other privilege
>
> (a) enters land in possession of another or any part thereof or causes a thing or third person so to do, or
> (b) remains thereon, or
> (c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner stated in §§ 160 and 161.
>
> is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests." Restatement of the Law, Torts, Vol 1, § 158.

Therefore, it is the taking of an owner's possessory interest in land as compared with interfering with an owner's use and enjoyment of his land that distinguishes a trespass which is a "taking" from a nuisance, which is not.

> "There is a distinction between a nuisance and a trespass, although many things are sometimes called nuisances which are mere trespasses, and it has been said that an action for a nuisance which violates a property right incident to the ownership of land is in the nature of one for trespass to realty. The difference is that a nuisance consists of a use of one's own property in such a manner as to cause injury to the property or other right or interest of another and generally results from the commission of an act beyond the limits of the property affected, while a trespass is a direct infringement of another's right of property. Thus, where there is no actual physical invasion of the plaintiff's property, the cause of action is for nuisance rather than trespass. * * *" 39 Am Jur 282, Nuisances, § 3.

*Morgan v. High Penn Oil Co.*, 238 NC 185, 77 SE2d 682.

Since a nuisance interferes with the enjoyment of the right to possess land, different rules of law apply to the balancing of the interests of owners. An owner's use of his own land will not create liability unless his use causes substantial interference with another's enjoyment of his property. 4 Restatement of Torts, Interference with the Use of Land, Ch 40, § 822, p 226. Also, the utility of the use that creates the nuisance must be weighed against the "gravity of the harm." Id, Ch 40, § 826, p 241, and Ch 40, § 828, p 250.

Such considerations are foreign to the law of trespass. A trespass imports damage and permits recovery, though no actual damage is caused. This rule of law is so well established citation of authority is unnecessary. There can be no balancing of interests.

Where a permanent trespass is committed by government, the constitution will not permit a balancing of the value of the taking for the benefit of the public against the interests of an owner. The owner must be fully compensated for his loss.

As pointed out, different policy considerations are involved in the laws of trespass which can ripen into a taking, and the laws of nuisance. The people have established these policy differences through the constitution and the enactment of laws which provide for entirely different procedures and considerations. See ORS 281.210, et seq., and ORS 105.505, et seq. This court ought not to exceed its powers to establish a different policy.

The distinction between what the law is, and a belief of what the law ought to be, is pointed out in

the case of *Batten v. United States,* 306 F2d 580 (10th Cir 1962). This case is directly in point with the issue before us, and the majority opinion therein sustains the position which I have taken here.

The majority here, as does Mr. Chief Judge Murrah in his dissent in *Batten v. United States,* supra, seeks to place consequential damage in the same category as a taking, without attempting to draw the distinction which has always existed in the law; that is, the taking of a possessory interest as opposed to damage.

A nuisance takes none of the title in the property. The full legal title rests in the owner. If the nuisance is abated in any manner, the damage suffered has ended and the land is again restored to its full value to the owner. On the other hand, if there is a taking, the property right of ownership or some interest therein has been transferred from the owner to the sovereign, and does not again revert to the original owner even though the use to which the property has been put by the sovereign ceases.

It may well be, as suggested by Chief Judge Murrah, that "fairness and justice, as between the State and the citizen, requires the burden imposed to be borne by the public and not by the individual alone." But the question of who should bear the burdens imposed by the creation and continuance of a great society created and maintained for the benefit of all, is, as pointed out herein, a political question to be resolved by a majority of the people through their elected representatives and not by judicial fiat.

As pointed out by the majority in *Batten v. United States,* supra, this course has been taken in many states by its citizens, and this is the course

which should be taken in this state, if the entire burden is to be borne by the public.

In setting forth the principles of law which should prevent this court as a matter of law, as well as policy, from commingling the remedies afforded under the law of eminent domain and nuisance, I do not wish to convey the thought that the plaintiffs are without a remedy. The discussion that the plaintiffs may have a remedy requires consideration of the majority's statement to the effect that an easement of nuisance may be created as between private individuals. The rule has no application to public nuisances.

This court has established the rule that a damage action lies against a municipality, which has the same immunity from suit as does the state, for the creation of a nuisance for the benefit of the public. *Wilson v. City of Portland,* 153 Or 679, 58 P2d 257.

We have also stated that the "convenience of the public" will not authorize the public to acquire an easement of nuisance by prescription. *Ulmen v. Town of Mt. Angel,* 57 Or 547, 112 P 529.

A careful reading of the case of *Richards v. Washington Terminal Co.,* 233 US 546, 34 S Ct 657, 58 L Ed 1088, cited by the majority, will show that this decision, which permitted a recovery of damages for a nuisance, was based upon the same principles announced by this court in *Wilson v. City of Portland,* supra.

It is true that the damage created by a nuisance may equal a taking of the whole, but this does not justify this court in stating that a nuisance may constitute a taking of a possessory interest in land, as contemplated by our constitution.

Since, as the plaintiffs state, this action was tried on the theory of inverse condemnation, the trial court committed no error in its rulings and the judgment should be affirmed. If the plaintiffs have suffered damage for a non-trespassory nuisance, they may seek redress in an action or suit, as provided by law.

For the reasons above set forth, I dissent.

Chief Justice McALLISTER and Justice ROSSMAN concur in this dissent.