[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I. FACTUAL BACKGROUND
Plaintiff once owned two parcels of land east of and adjacent to Runway 11/29 of the Bridgeport owned Sikorsky Airport in the town of Stratford. For ease of reference, the parcels will be referred to as the cafe parcel and the housing parcel (denoting the use to which each parcel was eventually put). The cafe parcel was closest to the end of the runway.
Plaintiff built a restaurant on the cafe parcel. The city, as a coplaintiff with the Commissioner of Transportation of Connecticut, sought an injunction against plaintiff adding a second floor to the restaurant. In Powers v. Ulichny, 185 Conn. 145 (1981), the Supreme Court ruled in favor of Ulichny, holding that the control that the city of Bridgeport sought could only be had by way of condemnation.
In 1977, plaintiff obtained a special case from the Stratford Planning Zoning Commission (PZ) to erect 72 housing units in six buildings on the second parcel. Defendant Bridgeport, as an aggrieved landowner, successfully appealed that decision to the superior court. In 1979, plaintiff obtained a special case from the P Z to erect the same number of housing units in three buildings. The City of Bridgeport appealed to the superior court a second time.
Ultimately, the cafe parcel was purchased by the city of Bridgeport. A condition of that purchase agreement was that the city would withdraw its then pending appeal of the P Z's decision to allow housing on the second parcel. (Exhibit 43, page 5.) The appeal as to the housing parcel was in fact withdrawn in April of 1982.
Plaintiff sold the housing parcel to Anthony Copertino, Jr., Trustee, on March 2, 1983, reciting in the deed that the consideration was less than $100.00. (Exhibit 59.) Copertino sold the parcel to Short Beach Condominium Associates on May 10, 1983 (exhibit 60). Plaintiff was one of three general partners of the Short Beach Condominium Associates and was entitled to 39 per cent of the profits. The next highest CT Page 6258 percentage of profit was 7.848 per cent to another general partner (exhibit 44). Eventually, Short Beach Condominium Associates erected housing units on the site.
In 1985 plaintiff brought the instant action against the city of Bridgeport claiming that the city's actions over the five year period 1977 to 1982 in allowing flights over the housing parcel, litigating the P Z approvals and withdrawal of the second appeal amounted to a "taking" of the housing parcel without compensation, i.e., an "inverse" condemnation. An inverse condemnation is a taking of property in fact even though there has been no formal exercise of the power of eminent domain. Thornburg v. Port of Portland, 233 Or. 178. Plaintiff seeks damages for this temporary taking from the defendant City of Bridgeport.
II. PROCEDURAL HISTORY
Each party filed a motion for summary judgment with supporting memoranda. The parties agreed that the court could decide the issues as if this had been a full court trial on the.
At oral argument, plaintiff abandoned his civil rights claim under the United States Constitution and laws and conceded that judgment could enter in favor of Stratford on the third count of his fourth amended complaint dated May 6, 1991, alleging failure of the town to enact airport zoning regulations.
The remaining claim is the inverse condemnation action against the city of Bridgeport. As part and parcel of that claim, plaintiff argues that the city obtained airport protection privileges without following the statutory procedures under Connecticut General Statutes 13b-43.[1] The factual history summarized above will be fleshed out as necessary by reference to the stipulation of facts or exhibits as the context requires.
Plaintiff claims that the city "took" his property by abusing legal process or by allowing overflights. The abuse of process claim arises out of the legal actions of the city in Powers v. Ulichny, supra, appeals of the Planning and Zoning Commission's approvals for housing, a claimed misrepresentation to the court in the first zoning appeal and the withdrawal of the second zoning appeal after the city acquired the cafe CT Page 6259 parcel.
Plaintiff further contends that overflights of the housing parcel from 1977-1982 constituted a taking of the property.
The abuse of process claim is at the heart of the plaintiff's complaint as stated succinctly at page three of his reply brief: "The plaintiff's claim is simple and direct. The city effectively temporarily took plaintiff's rights in the property itself by preventing its development under a claim that its proximity to runways should not allow development for housing." Plaintiff stated at page two of his reply brief: "It [the city's claimed prescriptive easement] did not give the city the right to continuously prevent plaintiff's development through legal action only to withdraw its legal action with respect to the condominium site once it had acquired title to the plaintiff's restaurant parcel and allow the very development that it claimed was dangerous and which it prevented over many years."
III. THE ABUSE OF PROCESS CLAIM
All parties submitted lengthy and able briefs on the issues. Although abuse of process is the plaintiff's major claim, the only case cited in direct support is Mozzochi v. Beck, et al, 204 Conn. 490 (1987). In that case the plaintiff sued defendant attorneys for allegedly pursuing litigation despite their discovery that their client's claim lacked merit. The trial court granted the defendant's motion to strike the claim and that ruling was affirmed on appeal. The court stated at page 494:
 An action for abuse of process lies against any person using a legal process against another in an improper manner or to accomplish a purpose for which it was not designed. . . . Because the tort arises out of the accomplishment of a result that could not be achieved by the proper and successful use of process, the Restatement 2d (1977) of Torts 682 emphasizes that the gravamen of the action for abuse of process is the use of a legal process . . . against another primarily to accomplish a purpose for which CT Page 6260 it is not designed. . . . (Emphasis added.) Comment B2 628 explains that the addition of "primarily" is meant to exclude liability when the process is used for the purpose for which it is intended but there is an incidental motive of spite or an ulterior purpose of benefit to the defendant. (Internal quotation marks and citations omitted.)
The plaintiff claims that the cumulative effect of the following actions constitute abuse of process:
A. The first appeal of P Z approval of a special case application for housing.
B. A claimed false representation to the court in the first appeal that the subject property was in an airport "clear zone."
C. The city's role in Powers v. Ulichny, supra.
D. The appeal of the P Z approval of the plaintiff's third application for housing.
E. Withdrawal of the second appeal after the city acquired the cafe parcel.
These claims will be examined individually and collectively.
A. THE FIRST ZONING APPEAL
On August 24, 1977, the P Z granted plaintiff's special case application to construct 72 units on the housing parcel. Plaintiff claims that the appeal, City of Bridgeport v. Planning Zoning, Stratford, et al, No. 118840, was part of a pattern of abuse of process. In his memorandum of decision in the case Judge Jacobson pointed out at page 3 that ". . . any person who is aggrieved by a zoning commission's decision . . . may take an appeal to the superior court. Connecticut General Statutes 8-8." (Exhibit 32, p. 3) Judge Jacobson went on to state at pages 5 and 6:
"Two exhibits in this case show that the CT Page 6261 plaintiff city is obligated, insofar as it is reasonable and within its powers, to prevent the establishment or creation of future airport hazards and to take appropriate action to restrict the use of land adjacent to, or in the immediate vicinity of, the airport to activities and purposes compatible with normal airport operations. . . . [Quitclaim deed between the United States and Reconstruction Finance Corporation and the City of Bridgeport; project application of the city.] . . . If defendant Ulichny builds his apartment buildings, the plaintiff city may lose its project grant obtained through the Federal Aviation Administration; it will be in violation of such Administration rules and regulations concerning clear spaces. Therefore, this court finds the plaintiff city is aggrieved and entitled to prosecute this appeal.
The court thus ruled that the city had the right to take the appeal.
In the appeal the city claimed that the proposed housing could be hazardous for the residents of such housing. Morgan Kaolian, then Superintendent of Operations at the airport, testified before the P Z that: ". . . it's the obligation of airport management . . . to protect their approaches to the runway." (Exhibit 25, P Z Minutes, p. 11.)
The city prevailed in this action, the court reversed the ruling of the P Z and plaintiff was unable to obtain certification for appellate review. Nothing in the appeal suggests any improper motive. The appeal was used precisely for its intended purpose: testing the propriety of the P Z decision.
B. THE CITY'S REPRESENTATIONS
Plaintiff makes much of the claim that the city misrepresented to the court that the apartment units proposed on the housing parcel would be a danger to air traffic because such housing would be in the airport's "clear zone." He argues that CT Page 6262 this misrepresentation misled the court and led to a reversal of the P Z approval in the first zoning appeal.
Exhibit 54, an advisory circular of the United States Department of Transportation, Federal Aviation Administration, defines clear zone or "runway protection zone" as "trapezoidal in shape and centered about the extended runway center line."
Plaintiff's claim rests on statements in two opinions by Judge Jacobson. In reversing the P Z action in the first zoning appeal, Judge Jacobson stated that ". . . after visiting the airport and the land involved, . . . [he was] at a loss to understand the defendant commission's reasoning leading to its granting `special case' status in this instance. What its decision would accomplish would be to locate a great number of families in the clear zone of a very busy airport; to do so, this court feels, is incomprehensible." (Emphasis supplied, Exhibit 32, p. 8.)
Plaintiff claims in his brief (page 35) that Judge Jacobson, ". . . later specifically stated that the defendant city represented to him that the plaintiff's land was in the `clear zone'." Apparently this claim rests on a statement in an opinion rendered over eight and a half years later in the instant case. In a memorandum of decision on the city's motion to cite in the Town of Stratford, Judge Jacobson said: "During the appeal, the defendant represented to the court that the plaintiff's land was in the `clear zone' at the Sikorsky Airport." (Exhibit 45, p. 2.)
Before analyzing this claim in terms of the statements of the court, it is important to note that the housing parcel was not in the airport clear zone and there is no direct quote of such a representation in the record of this case.
When the city opposed plaintiff's original application to erect a 100 unit apartment house on the parcel, there was no claim that such construction would be in the airport clear zone. Nicholas Mainiero, then Airport Manager, stated by way of a letter of opposition dated November 15, 1972, that the city's objection was threefold:
 1. The structure could become an obstruction to the airport and thereby penalize Runway 11-29 operations. CT Page 6263
 2. The unit would invite the raising of television antennae or other obstructions such as trees, flagpoles, etc.
 3. Families moving into units might find the airport facility a nuisance or a hazard to their health and fight to close it.
The then Planning Administrator for the Town of Stratford asked the Town Engineer to consider, among other matters, whether the proposed construction would be in an airport clear zone. (Exhibit 4.) The Town Engineer replied (exhibit 5) as follows: "The Engineering Department has reviewed the clear zone area for the 11-29 runway with respect to the above proposed development. We can find no interference or intrusion into the required clear zone. The project lies within the so-called transition zone to the southeast of the runway. . . ."
Nicholas Mainiero, then Airport Manager, wrote to the Planning Zoning Commission under date of August 15, 1977, opposing a second application which was the subject of the first zoning appeal. Mr. Mainiero virtually echoed the opposition stated in 1972 stating:
 The approval of such construction of high density dwellings, virtually on the threshold of our secondary runway, would be contrary to every rule of sound judgment. From the standpoint of aeronautics and that of the comfort and well-being of the apartment residents, the result would be unsafe and irresponsible.
 The approval of Mr. Ulichny's 72 family apartments would locate an estimated 200 persons in a small area off a runway that has been selected the preferential runway as a noise abatement move for Lordship residents and in the interest of safety.
Nowhere in the letter does Mr. Mainiero assert that the housing would be in an airport clear zone. CT Page 6264
At the P Z hearing on the second application for a special case Morgan Kaolian, then Superintendent of Operations at the airport, stated that, ". . . the condominium as it now stands is indeed out of the clear zone. . . ." (Exhibit 25, p. 4., emphasis supplied.) Plaintiff points to nothing by way of testimony or documents (other than Judge Jacobson's statements) to support the claim that defendant City of Bridgeport claimed that the proposed housing would be in a clear zone.
The court reviews the record in a zoning appeal. Calandro v. Zoning Commission, 176 Conn. 439, 440 (1979). Nothing was presented in the instant case to show that Judge Jacobson heard evidence in addition to the record on the first zoning appeal. Plaintiff's counsel, at the third P Z hearing, stated that Judge Jacobson [with respect to the second application] had not had the benefit of "good and accurate testimony." (Exhibit 37, p. 6.) This reference was apparently to testimony before the P Z on the second special case application. Courts do not lightly interfere with zoning commission decisions. Marmah, Inc. v. Town of Greenwich,176 Conn. 116, 123 (1978). Judge Jacobson had the benefit of the record of the second zoning hearing, including the statement of Morgan Kaolian that the property was definitely not in a clear zone. Any representation by the city would certainly not have been evidence and any such representation would have flown in the face of the declaration by the city's own employee at the zoning hearing.
The linchpin of Judge Jacobson's decision was actually the health, safety and welfare of the public. At page 9 of his decision (exhibit 32) he stated that the zoning commission's decision was arbitrary and capricious because it did not give "adequate consideration to the public's health, safety and welfare required by Stratford zoning regulations in such instances."
Assistant City Attorney, Louis Stein, later characterized the words "clear zone" as a "slip of the written tongue" (exhibit 37, p. 8) because Judge Jacobson was presumably aware that the city was not claiming that the property was in a clear zone.
The other reference by Judge Jacobson to a "clear zone" was eight and a half years later in his memorandum of CT Page 6265 decision on a motion to cite in the Town of Stratford in the instant case. This court cannot determine on this record whether that statement emanated from a review of his earlier decision in the zoning appeal or from his independent recollection. Further, at the time of the first zoning appeal plaintiff owned both parcels. Did the reference to land mean the cafe parcel? The housing parcel? Or both? When "during the appeal" was such a representation made? Was it in oral argument? Was it on some preliminary motion? The plaintiff asks this court to infer that the city must have made a representation in the first appeal that the housing parcel was in an airport clear zone when the record shows a direct disclaimer by the city that the property was in such a zone.
The term "clear zone" may not have been used in its precise technical meaning. Indeed this may well have been what plaintiff's counsel meant by his statement that Judge Jacobson had not had the benefit of "good and accurate testimony." The testimony of the Town Engineer referred to above was to the effect that the housing parcel was in a transition zone and there may well have been a confusion of terms. There might also have been a confusion of parcels. Exhibit 48, a letter from the United States Department of Transportation, states at page four:
 Likewise, R/W 29 clear zone has been the subject of much controversy and legal action. Specifically, the Ulichney (sic) property. Most recently, the newspapers indicated an agreement was reached to purchase the property.
This "clear zone" reference was obviously to the cafe parcel which the city did, ultimately, indeed purchase.
Even if such a representation had been made, it would not have been a proper consideration for Judge Jacobson in the first zoning appeal. That matter was reviewed on the record before the court. Plaintiff was unable to obtain certification to appeal that decision so the ruling stands. This court cannot find that the claimed misrepresentation was even made. It certainly cannot find that it was the basis of Judge Jacobson's decision.
C. THE POWERS v. ULICHNY CASE CT Page 6266
Ulichny applied for a permit to add a second story to a restaurant he had built on the cafe parcel. The town attorney for Stratford notified the Commissioner of Transportation of the application and the Commissioner objected on the ground that the proposed addition would endanger air safety as it would protrude into the approach zone of Runway 11/29 of the airport. The defendant obtained a building permit and the Commissioner obtained an ex parte temporary injunction during construction. In the action for a permanent injunction, the city of Bridgeport intervened as a party plaintiff. A permanent injunction was granted and the defendant Ulichny appealed.
In reversing the trial court judgment, the Supreme Court held that the city of Bridgeport had to comply with Connecticut General Statutes 13b-43, supra, (procedures for taking land for airport purposes) and pay for any interest obtained. The court also relied on Connecticut General Statutes15-74 which provided, in part:
 The commissioner shall cause notice to be given to the owner or person responsible for the existence of any obstacle so located as to constitute a hazard to aerial navigation or to the efficient or safe use of any airport, requiring such owner or other person to remove such obstacle within such reasonable time as is fixed by said commissioner. The owner or owners of such airport shall pay to the owner of such obstacle just compensation for such removal. . . .
The court went on at page 155 to state:
 Because obtaining a permanent injunction with respect to an airport hazard is the functional equivalent of acquiring an interest in the hazard, the trial court erred in granting the plaintiff such relief before they complied with the necessary preliminary procedure.
The Commissioner of Transportation obtained the temporary injunction and sought the permanent injunction. The city of Bridgeport was an intervening plaintiff but not the CT Page 6267 initiator of the litigation. It is important to note that the court did not hold that the city had condemned plaintiff's property (as plaintiff contends). Nor did it decide that the addition to the restaurant was not hazardous. Powers v. Ulichny held simply that the city had to buy what it was attempting to obtain by way of injunction. That is exactly what the city did when it purchased the parcel outright for $660,000.00. (Exhibit 58.) The fact that the city acquired the property for what the court must presume was a fair price militates against a finding of abuse of process.
Although plaintiff claims that the city's litigation was only for the purpose of acquiring the cafe parcel (presumably by forcing a sale), the evidence is to the contrary. Plaintiff first applied for a special case to construct 100 units in the housing parcel on October 6, 1972 (exhibit 2). In fact, he was only a prospective purchaser at that time. (Exhibits 1 and 2) Nicholas Mainiero, then Airport Manager, objected to the application for the reasons stated earlier (exhibit 3). Ulichny did not apply for a permit to construct the restaurant on the cafe parcel until 1977 (exhibit 21). The city's opposition to the housing because of safety concerns was consistent over the years before and after the restaurant was built. This runs counter to plaintiff's claim that such opposition was manufactured only as leverage to acquire the cafe parcel. The city acted because of a legitimate concern for airport safety.
D. THE SECOND ZONING APPEAL
In October of 1979 plaintiff petitioned the Stratford Planning Zoning Commission to construct 72 units in three buildings on the housing parcel. This was a change from the earlier petition for six 12 unit buildings. A special case was granted in December, 1979 and in January, 1980 the city of Bridgeport appealed from that approval by the Stratford Planning Zoning Commission. As an aggrieved property owner, the city of Bridgeport had the legal right to appeal the granting of plaintiff's special case application.
Defendant city had successfully appealed the granting of the earlier application allowing the same number of housing units. The only significant difference in the applications was that the second proposed that the units be contained in three rather than six buildings. The second appeal could hardly be CT Page 6268 said to be an abuse of process based on the city's earlier legal success and the court's finding that the earlier P Z decision had not adequately addressed public health, safety and welfare.
E. WITHDRAWAL OF THE SECOND APPEAL
Plaintiff claims that the withdrawal of the second appeal in conjunction with the purchase of his cafe parcel was the culmination of the city's abuse of legal process. Plaintiff and the city of Bridgeport entered into an agreement wherein the city was to purchase the plaintiff's cafe parcel. (Exhibit 43) Withdrawal of the appeal was explicitly made a condition of the agreement (page 5 of exhibit 43). That clause states:
 It is a substantial further condition and legal consideration for this agreement that the buyer will, immediately upon receipt of approval of this transaction by the Common Council of the City of Bridgeport, withdraw its pending appeal from approval given by the Stratford Planning and Zoning Commission to the seller, relating to an adjoining parcel, said appeal pending in the Superior Court at Bridgeport in an action bearing docket number. . . .
The city bought the cafe parcel "for the purpose of protecting the clear zone in relation to one of the runways located at the Bridgeport airport." (Contract, exhibit 43, p. 4)
This agreement was obviously intended to resolve the then existing disputes between the plaintiff and the city of Bridgeport over both parcels. Compromise is inherent in such resolutions. It is reasonable to infer that the city dropped its opposition to the proposed housing because ownership of the cafe parcel was sufficient protection of the runway clear zone.
In summary, each of the legal steps taken by the city was designed to protect the airport and public safety. The city prevailed on its first appeal with respect to the housing parcel and withdrew the second as part of the agreement with the plaintiff. Nothing in the evidence supports plaintiff's claim that the city abused legal process for an improper purpose. While the Supreme Court did rule against the city in Powers v. Ulichny, merely being on the losing side of a lawsuit is not CT Page 6269 abuse of process unless the test of the Mozzochi case is met. Smith v. Globe Ford, Inc., 39 Conn. Sup. 27, 34 (1983), states, "The essence of abuse of process is misuse of the process, . . . for a purpose other than that which it was designed to accomplish." Lodges 743 and 1746, etc. v. United Aircraft Corp., 534 F.2d 422,465, cert. den., 97 S.Ct. 79, 2 cases, 429 U.S. 825, states: "Abuse of process requires more than simply an improper motive. There must also be some action taken to utilize the court's processes for collateral purposes not related to suit in question. . . ." The fact that the city had an interest in purchasing or acquiring the cafe parcel does not transform its actions into an abuse of process. Here all the legal procedures which the city utilized were exactly for the purposes for which such process was intended. Any ulterior motive or benefit to the defendant city was incidental to its use of legal process to keep the airport safe.
The contention that abuse of process occurred and amounted to a temporary taking of the housing parcel from 1977 to 1982 is strained at best. Plaintiff has not proven an inverse condemnation under this theory.
IV. OVERFLIGHTS OF PLAINTIFF'S PROPERTY
Defendant claims that during the years 1977 to 1982, the actions of the defendant City of Bridgeport in allowing overflights of his property constituted a taking. Although this issue was extensively briefed, the evidence of a taking by overflights is lacking. There is no evidence as to the frequency of the flights, altitude of the flights or noise levels. Appendix 1 attached to plaintiff's reply brief is a "Master Plan Update and Environmental Impact Assessment." It points out the number and type of aircraft based at the airport for the years 1962 through June of 1980. ( Page 29) The tower counts of operations for the years 1971 to 1980 is stated at pages 30 and 31 of that exhibit. Those counts range from 152,933 for the year 1972 to 197,400 for the year 1978.
In U.S. v. Causby, 328 U.S. 256, (1945) the Supreme Court held that the government had taken a flight easement by its low flights over Causby's chicken farm and, therefore, had to pay compensation under the Fifth Amendment for such taking. The owner and operator of the planes was the United States government which was ordered to pay. Griggs v. Allegheny County, 369 U.S. 84 (1961) is illustrative of the kind of CT Page 6270 detailed evidence needed to establish a taking by overflights. At page 86 of that opinion the court said, "The slope gradient of the approach area . . . leaves a clearance of 11.36 feet between the bottom of the glide angle and petitioner's chimney." (Emphasis added.) The court went on at page 87 to state, "The planes taking off . . . observed regular flight patterns ranging from 30 feet to 300 feet over petitioner's residence; and on let down they were within 53 feet to 153 feet." Plaster fell from the walls and ceilings, the windows rattled and the noise was deafening. The homeowners eventually had to vacate their property because of the low flights.
There is no such evidence with respect to the overflights in this case. For that reason, plaintiff cannot prevail on this claim.
Although the court's rulings on the plaintiff's claims are dispositive, the several defenses raised by the city of Bridgeport will be discussed to complete the record in the event of appellate review.
The city makes the following claims by way of defense and special defense:
1. The city of Bridgeport has no power to condemn property in Stratford; therefore, it has no power to acquire by inverse condemnation.
2. The applicable statute of limitation bars this claim.
3. The issues raised by plaintiff have been previously decided; therefore, the claims are barred by principles of res judicata and collateral estoppel.
4. Bridgeport acquired an navigational easement over the property prior to this lawsuit.
I. DEFENDANT BRIDGEPORT'S CONDEMNATION POWER
The city of Bridgeport claims that it has no power to condemn land in another municipality. It argues that, if it cannot condemn land directly, it cannot take it indirectly by way of an inverse condemnation as claimed by plaintiff. This claim warrants little discussion. Defendant cites Connecticut General Statutes 48-6 which provides: CT Page 6271
 Any municipal corporation having the right to purchase real estate for its municipal purposes which has, in accordance with its charter or the general statutes, voted to purchase the same shall have power to take or acquire such real estate, within the corporate limits of such municipal corporation, and if such municipal corporation cannot agree with any owner upon the amount to be paid for any real estate thus taken, it shall proceed in the manner provided by section 48-12 within six (6) months after such vote or such vote shall be void. [Emphasis added.]
Defendant also claims the benefit of the following general rule: "A municipality can exercise the right of eminent domain only when it is conferred upon it by the legislature expressly or by necessary implication, since a municipal corporation has no more right than any other corporation to condemn property." 11 McQuillan, Municipal Corporations, 3d Ed. rev. (32.12).
This claim would have merit except that Connecticut General Statutes 13b-43, supra, fn. 1, specifically allows a municipality which owns an airport at any location to "take any land or interest therein necessary." The statute provides for compensation for such taking.
Plaintiff also claims that, as part of the inverse condemnation, defendant city acquired airport protection privileges without following the statute. Connecticut General Statutes 15-73 states in relevant part:
 Where necessary in order to provide unobstructed air space for the landing and taking off of aircraft . . . in case of municipal airports, the municipality, is granted authority to acquire, in the same manner as is provided for the acquisition of property for airport purposes, easements through or other interests in airspace over land or water, interests in airport hazards outside the boundaries of the airports . . . or CT Page 6272 restricted landing areas, and such other airport protection privileges as are necessary to insure safe approaches to the landing areas of such airports and restricted landing areas and safe and efficient operation thereof.
These statutes confer upon the city the very power of eminent domain and consequently the power of inverse condemnation that it claims it does not have.
II. THE STATUTE OF LIMITATIONS
Defendant city argues that plaintiff's claim against it is barred by Connecticut General Statutes 52-584 which states, in relevant part:
 No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, . . . shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of. . . .
Plaintiff sold his interest in the property to Anthony Copertino, Jr. on March 2d 1983 (exhibit 59). The actions of which plaintiff complains allegedly occurred between 1977 and April 20, 1982. The instant lawsuit was commenced on December 16, 1985 and defendant city contends that it was beyond the statute of limitations.
Connecticut General Statutes 52-584 covers injury to property but not a taking of an interest therein. Inverse condemnation is generally not considered a tort. The court agrees with plaintiff that the general rule limiting an inverse condemnation claim is:
 That in the absence of any specifically applicable statute of limitations, directly provided by a statute pertaining to CT Page 6273 landowners' actions for compensation for the taking of land for public purposes . . . no statute of limitations short of the period required to obtain title by adverse possession . . . or no statute of limitations at all, not even the period provided for adverse possession, may bar the landowner's action, some of the courts reasoning that the right to compensation for a taking without compensation is a constitutionally protected fundamental right that cannot be restricted by mere construction, at least without legislative provision.
Inverse Condemnation Limitation, 26 ALR 4th, section 2, p. 73.
McQuillan, Municipal Corporations, Vol. 11A, Section 32-133, pages 281, 283, states:
 Some states have a special statute of limitations applicable to inverse condemnation actions that governs the time in which the action must be brought. In other states, one of the general statutes of limitations, usually the provision governing real property actions, is applied.
 It can be difficult to determine exactly when the statute of limitations begins to run and when the owner's cause of action accrues since there is usually no specific date that can be shown as the date when the taking occurred. One rule that is applied is the tort rule providing that the limitations period begins to run on the date when the injury occurs or when the owner has reasonable notice or knowledge of the injury or damage to the land. Another rule applied is that the cause of action accrues at the time the taking is complete. While these rules may be useful when there has been an actual seizing of the property, these rules are difficult to apply where the taking is the result of a gradual increase in activities or acts over a long period of CT Page 6274 time, such as increasing airport traffic, that ultimately results in a substantial impairment or destruction of the use and enjoyment of the property. . . .
 An inverse condemnation claim may be barred where the governmental body has become vested with a prescriptive right of easement. Such a prescriptive right arises where the governmental interference with the owner's use of the property is for the statutory period governing prescription and the elements necessary to constitute adverse possession are present. However, in the absence of such a prescriptive right, a claim for inverse condemnation is not barred by the passage of time. . . . [Emphasis added.]
Defendant has not shown that the time limits in the applicable statutes for acquiring title or an easement by adverse possession have passed here. Connecticut General Statutes 52-575 states in relevant part: "No person shall make entry into any lands or tenements but within 15 years next after his right or title to the same descends or accrues;. . . ." Connecticut General Statutes 47-37 states:
 No person may acquire a right-of-way or any other easement from, in, upon or over the land of another, by the adverse use or enjoyment thereof, unless the use has been continued uninterrupted for 15 years.
The passage of time alone (except for prescriptive or adverse possession rights) does not bar an inverse condemnation claim. Petersen v. Port of Seattle, 94 Wash.2d 479, 618 P.2d 67
(1980).
Defendant cites no authority for the proposition that inverse condemnation is a tort. "Inverse condemnation is, therefore, a cause of action against a government defendant to recover the value of property which has been taken in fact by a governmental entity although not through eminent domain procedures." McQuillan, Municipal Corporations, Vol. 11A, p. 266. "Since it [inverse condemnation] is not based on contract CT Page 6275 or tort principles . . . an inverse condemnation proceeding may be available to the landowner where other remedies may be limited or barred." Id., 32.132.20, p. 266, 267.
For the foregoing reasons, the plaintiff's claim would not be barred by the statute of limitations contained in Connecticut General Statutes 52-584. Although plaintiff briefed the applicability of Connecticut General Statutes52-577, defendant's claim is that the action is barred with respect to the city of Bridgeport by virtue of Connecticut General Statutes 52-584. There is no need to discuss whether the claim against the town of Stratford is barred by Connecticut General Statutes 52-577 as there is no objection to a defendant's judgment with respect to the town of Stratford.
III. RES JUDICATA AND COLLATERAL ESTOPPEL
Defendant city claims that the issues presented by this complaint were decided in docket number 118840, City of Bridgeport v. Planning Zoning Commission of the Town of Stratford, et al, Superior Court, Fairfield Judicial District, 4/30/79 (Jacobson, J.).
Brockett v. Jensen, 154 Conn. 328, 337 (1966), states that: "This defense, which is more properly described as collateral estoppel, is that aspect of res judicata which is concerned with the effect of a final judgment on the subsequent litigation of a different cause of action involving some of the issues determined in a former action between the parties."
The case on which defendant city relies was an appeal from a Stratford Planning Zoning Commission's granting of the plaintiff's application for a special case to construct six 12 unit residence apartments on the housing parcel. Defendant city points out paragraphs 12, 13, 14 and 18 of plaintiff's count against the City of Bridgeport as demonstrating that this is actually an attempt to relitigate the issues previously decided in City of Bridgeport v. Stratford P Z, supra. Those paragraphs of plaintiff's complaint are as follows:
 12. On September 13, 1977, the City of Bridgeport took an appeal from the decision of the commission. As a result of the pendency of this appeal, CT Page 6276 the plaintiff was unable to obtain financing for the development of his property.
 13. Upon information and belief during the trial of the zoning appeal, the City of Bridgeport misrepresented to the court that the plaintiff's land was in the "clear zone" of the Sikorsky Airport.
 14. The court, Jacobson, J., by memorandum of decision dated April 30, 1979 sustained the City of Bridgeport's appeal stating, ". . . the defendant commission's reasoning leading to its granting `special case' . . . would be to locate a great number of families in the clear zone of a very busy airport. . . ."
 18. On January 4, 1980, the City of Bridgeport filed an appeal from the decision of the commission in the Superior Court.
Plaintiff is not attempting to relitigate the issues decided by Judge Jacobson; rather, he relies on the litigation in support of his claim that the city abused legal process to take his property. To that end he accepts (as he must) the decision as there was never an appeal. Plaintiff points to this allegedly improperly obtained decision as proof of his claim that the City of Bridgeport abused legal process to obtain his property.
Inverse condemnation was not at issue in the appeal decided by Judge Jacobson. Nor were any elements of inverse condemnation litigated. The alleged actions of the city were not at issue in that appeal. That court had to decide whether or not the actions of the Planning Zoning Commission were illegal, arbitrary or in abuse of its discretion.
In the instant case the alleged actions of the city are, in fact, at issue. Whether or not there was a taking by inverse condemnation of the plaintiff's property does not require a relitigation of the propriety of the P Z approval at CT Page 6277 issue before Judge Jacobson.
IV. DEFENDANT'S CLAIM OF AN NAVIGATIONAL EASEMENT
Defendant city claims that it had acquired an navigational easement in and over the subject property prior to the institution of this lawsuit. The short answer to this claim is that the city's contention suffers from the same lack of proof as plaintiff's overflight claim. Further, the land in question was unimproved during the years 1977 — 1982.
Brennan v. Ventura County, 38 Cal.App.3d 84 (1974), points out that there can be no adverse use unless the flights substantially interfere with the use of the land. Where the owner made no use of the land during the prescriptive time period, overflights could not constitute an adverse use.
There is no evidence of the frequency of the flights, the altitudes, noise levels or any of the factors the court must consider in determining whether or not the city has indeed acquired an navigational easement over the subject premises.
For all of the foregoing reasons, the court enters judgment for the defendants on the plaintiff's fourth amended complaint.[2]
E. EUGENE SPEAR, JUDGE